ELLEDGE 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-93-259-CR





RICHARD ELLEDGE,




 APPELLANT


vs.





THE STATE OF TEXAS,



 APPELLEE 



 




FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT



NO. CR92-0302-A, HONORABLE DICK ALCALA, JUDGE PRESIDING



 



 A jury convicted appellant, Richard Elledge, of injury to a child and sentenced him
to ninety-nine years. See Tex. Penal Code Ann. § 22.04 (West Supp. 1994). Elledge argues that
the trial court erred by denying his motion for new trial based on newly discovered evidence, his
request for a three-day continuance, and his motion for mistrial based on jury misconduct. We
will affirm the trial-court judgment. 



BACKGROUND


 Appellant, Richard Elledge, and Elisa Bartlett were the parents of Richard Garrett
Elledge, Jr., a five-week old infant. On February 13, 1992, they took their child to the
emergency room of a community hospital. The right side of the child's head was severely
swollen; he appeared pale and could not breathe. The infant died two days later. The doctor who
performed the autopsy testified that the baby suffered from craniocerebral trauma that included
massive edema, or swelling of the brain. The right side of his skull was fractured and the baby
had bleeding under the covering of the right side of the brain. Both the medical examiner and the
treating physician testified that the injuries were caused by a considerable blow to the head. In
addition, the treating physician testified that the child had previous injuries as evidenced by a
subdural hematoma that was probably a few weeks old. The treating physician testified that, in
his opinion, based on the swelling present when he saw the child, the fatal injury occurred within
an hour of the infant's arrival at the hospital at 7:23 p.m. 

 Appellant defended on the grounds that Bartlett, the baby's mother, fatally injured
the child. Each parent testified to the times they were at home with the baby on the day in
question. Bartlett had spent the majority of the morning alone with the baby while appellant was
job interviewing and making calls outside the home. Around 3:30 or 4:00 p.m., appellant
returned home. Bartlett left appellant alone with the baby to visit her mother. As she was
leaving, she noticed that the baby's head looked bigger and out of proportion. The baby was
asleep when Bartlett returned home at approximately 5:30 p.m. 

 After Bartlett returned home, she and appellant went out on the balcony to smoke. 
Appellant talked with his neighbor Melvin Smith, and Bartlett saw her friend, Robbie Noyes,
walking down the street. Noyes testified that she saw Bartlett on the balcony at approximately
5:40 p.m. Bartlett went down to talk to Noyes and went to Noyes' apartment to see Noyes' baby
daughter. Around 6:30 p.m., Bartlett returned to her apartment with Noyes to show her the baby. 
Bartlett introduced Noyes to appellant in the living room and then Bartlett and Noyes went to the
baby's room. Bartlett and Noyes then returned to the living room and watched television with
appellant. 

 During this time, appellant went into the baby's room twice. Appellant testified
that on the first occasion, he gave the baby some water that Bartlett had prepared for him while
Bartlett stood in the doorway watching him try to feed the baby. On the other occasion, appellant
went to the baby's room when he heard the baby make a faint cry. Appellant testified that upon
checking on the baby, he told Noyes and Bartlett that the baby's head had fallen between the
pillow of the bed and the railing and that the baby's arm was wrapped around one of the bars. 
Appellant further testified that he moved the baby over to the middle of the crib and that Bartlett
came to the door to look. 

 Noyes testified that she left the apartment around 7:10 p.m. Bartlett and appellant's
testimony conflict as to when they discovered that the baby needed to go to the hospital. 
Appellant testified that after Noyes left, appellant and Bartlett went out to smoke and then decided
to feed the baby; as appellant picked the baby up, Bartlett started screaming when she saw the
baby's head. Bartlett testified that as Noyes was leaving, appellant decided to give the baby some
water; appellant was holding the baby when Bartlett brought the water to him, and she noticed that
the baby was white and his head was very swollen. Bartlett and appellant then took the baby to
the hospital.



DISCUSSION


 In his first point of error, appellant argues that the trial court erred in denying his
motion for new trial based on newly discovered evidence. (1) At the hearing on the motion, Trisha
Lombrana testified that when the baby was about one-week old, she saw Bartlett hit him in the
head because the child would not be quiet; she said that Bartlett hit him "pretty hard," and that
the baby was screaming. She further stated that Bartlett could not handle the baby's crying. 
Lombrana felt the that the blow was dangerous to the child's health. Lombrana also testified that
she never told appellant because she was afraid he would say she was lying. She further
acknowledged that she had never talked to appellant's counsel about this matter before coming to
his office after the trial.

 In order to direct a new trial based upon new evidence, the Court must determine
that: (1) the newly discovered evidence was unknown to the movant at the time of his trial; (2)
the movant's failure to discover the evidence was not due to his lack of diligence; (3) the
materiality of the evidence is such as would probably bring about a different result in another trial;
and (4) the evidence is admissible, and not merely cumulative, corroborative, collateral, or
impeaching. Drew v. State, 743 S.W.2d 207, 226 (Tex. Crim. App. 1987), cert. denied, 114 S.
Ct. 1207 (1994). The record reflects that the first requirement was met: Lombrana testified that
appellant did not witness this event and that she did not inform him of it. However, no evidence
was offered indicating why the evidence could not have been discovered, through the exercise of
diligence, at or before the time of trial. See Mitchell v. State, 494 S.W.2d 865, 866 (Tex. Crim.
App. 1973), cert. denied, 414 U.S. 1163 (1974); Huffman v. State, 479 S.W.2d 62, 69 (Tex.
Crim. App. 1972).

 With respect to the third and fourth requirements, the new evidence must be
"probably true." Should it appear to the trial court that under the circumstances of the particular
case the credibility or weight of the new evidence is not such as would probably bring about a
different result upon a new trial, it is within its discretion to deny the motion. Jones v. State, 711
S.W.2d 35, 37 (Tex. Crim. App. 1986). Thus, the trial court may properly consider the weight
and credibility of the new evidence in ruling upon a motion for new trial. Id. at 37 n.3. 
Moreover, whether the newly discovered evidence would likely produce a different result must
be viewed in the light of the whole case. Henson v. State, 200 S.W.2d 1007, 1011 (Tex. Crim.
App. 1947) (opinion on rehearing).

 The State argues that the medical testimony about the timing of the head injuries
and appellant's admission about when he had sole custody of the baby established that appellant,
not the mother, was the perpetrator. At trial, the physician who treated the infant at the hospital
testified that, based on the swelling of the infant's head when he treated him, the injury occurred
within an hour of the baby's 7:23 p.m. arrival at the hospital. Thus, the State argues the record
shows that appellant was the only one who was alone with the baby during that hour, so the new
evidence would not have brought about a different result. We agree. 

 Based on the medical testimony, the fatal injury could have occurred: (1) when
appellant was with the baby while Bartlett was at Noyes' apartment; (2) when Bartlett, Noyes, and
appellant were in the apartment with the baby; or (3) when appellant and Bartlett were in the
apartment with the baby after Noyes left. Appellant agreed on cross-examination that to his
knowledge, Bartlett had not been alone with the baby from 3:55 p.m. until the baby was taken to
the hospital. Appellant also testified that he was alone with the baby within the last hour for a
brief few minutes. 

 The undisputed medical testimony in the record placed the appellant as the only
person alone with the baby when the fatal injury was inflicted. We conclude that the trial court
did not abuse its discretion in determining that, under the circumstances of this case, the weight
of the new evidence would probably not bring about a different result upon a new trial. The first
point of error is overruled.

 In his second point of error, appellant argues the court erred in not giving counsel
a three-day continuance to review a third statement made by Bartlett that counsel discovered only
during cross-examination at trial. In the third statement, Bartlett stated that as she was leaving
the baby with appellant to go visit her mother, she remembered telling appellant that the baby's
head looked deformed. She further stated, "That's all that was swollen [his left eye]. And I
remember . . . I remember feeling Rick's forehead and it . . . it felt like that, what you were
explaining to us, it felt mushy . . . . It felt puffy, not mushy, just puffy." Appellant argues that
the statement is exculpatory and discoverable. He argues that had the statement been disclosed,
an expert would have assisted the trier of fact on the meaning of a "mushy" forehead without
having to rely on the State's expert witnesses. Appellant argues that failure to grant the
continuance was unreasonable and compromised the verdict by denying him effective assistance
of counsel.

 A continuance may be granted after the trial has begun when it appears to the
court's satisfaction that by some unexpected occurrence since the trial began, which no reasonable
diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be
had. Tex. Code Crim. Proc. Ann. art. 29.13 (West 1989). We conclude that appellant was not
so surprised by the discovery of this third statement upon cross-examination that a fair trial was
prevented. The third statement was a written transcription taken from a tape recording. The
contents of the statement are substantially similar to a written statement provided to counsel before
trial. While the statement provided before trial did not mention that the baby's head appeared
puffy or mushy, it said that the baby's head looked deformed at the time Bartlett left to visit her
mother. Therefore, counsel had prior notice that the infant's head appeared deformed and,
therefore, notice to obtain expert witnesses to investigate whether it was possible for the fatal
injury to the head to have occurred earlier in the afternoon when Bartlett was alone with the baby
before she left to visit her mother. Because the third statement was substantially the same in this
regard as the statement shown to appellant's counsel before trial, we do not believe the third
statement created a probability sufficient to undermine our confidence in the outcome of the
proceeding. See Thomas v. State, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992). 

 Moreover, counsel effectively cross-examined Bartlett about her statement that the
baby's head looked deformed and made clear to the jury that at that time of the day, "Garret
[Richard Elledge] had just gotten home. He had never been alone with the baby, had he?" to
which Bartlett answered, "No, sir." He further cross-examined Bartlett about her statement that
the child's forehead was "mushy." Counsel also had the opportunity to question the treating
physician about what would make the child's head feel mushy. The physician agreed that a mushy
or puffy head would be consistent with a deformed skull. Appellant's counsel asked the
physician: "Hypothetically, if there had been testimony offered in this courtroom that it was
noticed at approximately three or four o'clock in the afternoon that the child's head appeared
deformed or swollen, is there anything about that would be consistent with what you noticed in
the emergency room?" The physician responded:


It is my opinion that the injury that I was looking at was very acute. . . . It was
swelling at the time right before my eyes. It was not something that I expect went
through any stages of stability and then changed. There's nothing that I know of
that would suggest that that would be plausible.



The physician also explained that from the onset of the trauma, the loss of the ability to breathe
would have taken from minutes to perhaps as long as a half hour or an hour. Therefore, counsel
had the opportunity to fully explore with an expert witness the timing of the fatal injury. Counsel
also got the State's medical expert to explain that the child had been injured before as evidenced
by a subdural hematoma that probably predated the fatal injury by a couple of weeks. The
medical testimony, however, showed that it was implausible for the fatal injury to have occurred
earlier in the evening. We conclude the trial court did not abuse its discretion in overruling the
motion for continuance. The second point of error is overruled.

 In his third point of error, appellant argues the trial court erred in denying his
motion for mistrial based on jury misconduct by juror Billie Williams. During trial, it was
discovered that Williams' daughter-in-law was a second cousin of Bartlett and third cousin of the
victim. When questioned on the stand, Williams testified that she did not know that her daughter-in-law was related to Bartlett, nor did she remember having any conversation with her daughter-in-law about this case.

 Out of Williams' presence, the daughter-in-law testified that she talked to her
mother-in-law about the case when she read about it in the paper and told her that she was second
cousins with Bartlett. She said she told her mother-in-law that she didn't feel Bartlett would have
had anything to do with the crime and that her father-in-law said in their presence that he thought
the father probably did it. The daughter-in-law testified that Williams expressed no opinion about
who might have injured the child and, as far as she knew, her mother-in-law had not formed an
opinion about the guilt or innocence of appellant.

 Juror Williams was brought back in. Without reference to the daughter-in-law's
or husband's conclusions, the court asked if Williams recalled having a conversation with her
daughter-in-law and her husband about the facts of this case. Williams replied, "No, sir, I really
don't. My memory is not very good anyhow, but I don't remember it." The court then asked,
"Have you in the past formed a conclusion or stated to someone that would indicate to someone
that you had formed a conclusion about the guilt or innocence of this defendant?" Williams
responded, "No."

 We conclude the trial court did not abuse its discretion in overruling the motion for
mistrial. As a mother-in-law of the deceased's third cousin, Williams is not related within the
third degree of consanguinity or affinity to the person injured by the commission of the offense. 
See Tex. Code Crim. Proc. Ann. art. 35.16(c)(1) (West Supp. 1994); Cortez v. State, 161 S.W.2d
495, 497 (Tex. Crim. App. 1942) (concluding that a juror whose sister married a second cousin
of deceased was not related to deceased in third degree); Texas Employers' Ins. Ass'n v.
McMullin, 279 S.W.2d 699, 702 (Tex. Civ. App.--San Antonio 1955, writ ref'd n.r.e.). The
record reflects that the juror did not intentionally give false information about her daughter-in-law's relationship to Bartlett's family. Moreover, there was no showing that such relationship or
prior discussion had any potential for bias or prejudice. See Decker v. State, 717 S.W.2d 903,
907 (Tex. Crim. App. 1983) (opinion on rehearing) (determining that it was not error to refuse
peremptory strikes after a juror was empaneled where juror did not intentionally give false
information during voir dire and information was not material because juror only knew
complainant from work). Williams testified that she had not formed an opinion about appellant's
guilt or innocence, and her daughter-in-law testified that she had not seen Bartlett in the past five
years and had not discussed the case with Bartlett or Bartlett's family. Moreover, any opinions
about the appellant's guilt by Williams' daughter-in-law or husband were not discussed at trial in
front of juror Williams, who could not remember having discussed the case. We overrule the
third point of error.

 The judgment of conviction is affirmed.



 

 Jimmy Carroll, Chief Justice

Before Chief Justice Carroll, Justices Kidd and B. A. Smith

Affirmed

Filed: November 23, 1994

Publish
1. See Tex. R. App. P. 30(b)(6), 11 Tex. Reg. 743, 747-48 (1986, disapproved by the Texas
Legislature, Act of May 29, 1993, 73d Leg., R.S. ch. 900, § 11.02, 1993 Tex. Gen. Laws
3586, 3765).