**Affirmed and Opinion Filed December 5, 2013**



In The

## Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-12-01073-CR

**ADA BETTY CUADROS-FERNANDEZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 380th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 380-80933-06**

## MEMORANDUM OPINION
Before Justices FitzGerald, Francis, and Myers
Opinion by Justice Francis

Ada Betty Cuadros-Fernandez appeals her conviction for capital murder. After the jury found appellant guilty, the trial court assessed punishment at life without parole. In three issues, appellant claims the evidence is insufficient to support her conviction and the trial court erred by admitting certain evidence. We affirm.

On October 13, 2005, McKinney firefighters and paramedics responded to a call about a sick infant at 1112 Woodhaven in McKinney. When they arrived, they found fourteen-month-old Kyle Lazarchik unconscious and unresponsive. They transported Kyle to the Medical Center of McKinney. Shortly thereafter, he was taken to Children's Medical Center in Dallas where a CAT scan showed he had significant head injuries. Kyle died two days later. Appellant was arrested and charged with capital murder.

In her first issue, appellant claims the evidence is legally insufficient to support her conviction. Appellant claims no evidence establishes she knowingly caused the injuries to Kyle that caused his death.

In a legal sufficiency review, we view all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury, as the sole judge of the credibility of the witnesses, is free to believe or disbelieve all or part of a witness's testimony. *Jones v. State*, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998). We do not engage in a second evaluation of the weight and credibility of the evidence but ensure the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993).

A person commits capital murder if she knowingly causes the death of an individual under six years of age. Act of May 19, 2005, 79th Leg., R.S., ch. 428, § 1, 2005 Tex. Gen. Laws 428, amended by Act of May 28, 2011, 82nd Leg., R.S., ch. 1209, § 1, 2011 Tex. Sess. Law Serv. 3235, 3235 (current version at TEX. PENAL CODE ANN. §19.03(a)(8) (West 2011)). Direct evidence of the elements of the offense is not required. *Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007). The identity of the person committing the offense may be proven by direct or circumstantial evidence. *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986). Juries are permitted to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Hooper*, 214 S.W.3d at 14–15. Circumstantial evidence alone may be sufficient to establish guilt. *Id*. at 15. If an adult defendant has sole access to a child when the child sustains an injury, the evidence is sufficient to support a conviction for injury to a child or murder if the child dies. *Cuadros-Fernandez v. State*, 316 S.W.3d 645, 654 (Tex. App.—Dallas 2009, no pet.); *Elledge v. State*, 890 S.W.2d 843, 846–47 (Tex. App.—Austin 1994, pet. ref'd).

The indictment and jury charge in this case alleged appellant knowingly caused Kyle's death by inflicting blunt force trauma on Kyle by striking his head against a cabinet door, a deadly weapon, or by means unknown.

At trial, Rene Lazarchik testified she and her husband, Mike, had four children: Alyssa, twin boys Kyle and Ryan, and Malia. Alyssa was about sixteen months old when the twins were born in August 2004. The Lazarchiks decided to hire a nanny for their three small children instead of using outside day care when Rene went back to work. They interviewed appellant and liked her. She had a sweet personality and disposition as well as a good sense of humor. Her parents lived in Peru where her father was a pediatrician and her mother a veterinarian. Appellant was a live-in nanny; the Lazarchiks agreed to this arrangement although they had requested a nanny who came to the house daily. When they offered the job to appellant, the Lazarchiks asked her to commit to being with them for eighteen months; appellant accepted, telling them she "hoped for five years." The Lazarchiks and appellant agreed that the Lazarchiks would not withhold funds from her paycheck, and appellant had the responsibility to report her income and pay income tax. Over time, the Lazarchiks thought of appellant as one of the family. Appellant had her own bedroom and bathroom at the house and ate meals with the family. According to appellant, she lived with her aunt and uncle on weekends.

Rene admitted to being a cautious and thorough person. She spent two weeks with appellant and the children before returning to work after maternity leave. During this time, she made sure appellant knew where everything was in the house and how to care for the children. Rene and Mike attended classes at the hospital specifically for parents of newborns and twins, and Rene shared the information and knowledge she gained from those classes with appellant. She spent time explaining the special issues involved with twins, such as picking up only one child at a time and writing down medicine given to avoid giving one twin a double dose. Rene

also admitted she is a worrier and said safety, particularly that of her children, was important to her. She asked appellant to keep logs on the children so she would know what had happened during the day while she was at work. Before the twins were born, Alyssa attended a daycare, made several friends there, and Rene decided Alyssa needed to continue going to the daycare occasionally for socialization. This also gave appellant a break from caring for three young children.

On Thursday, September 29, 2005, appellant told the Lazarchiks her aunt and uncle were going back to Peru, then moving to Germany, and that she would be going with them. Appellant indicated she had a lot to do to settle her relatives' affairs before they moved at the end of October but said she would stay with the Lazarchiks until that time. Rene was surprised at hearing about the move, particularly since they had asked appellant for a minimum eighteen-month commitment. She also was concerned about whether appellant would take care of her income taxes which would be due the following April. The Lazarchiks usually paid appellant on Fridays; however, the day after appellant announced she was leaving, Rene told appellant she was not going to pay her until Monday because she wanted the weekend to "figure out what [their] liability was if any" with respect to the income tax issue.

The following Monday, Mike arrived home from work early to find appellant had cleaned out her room and quit. Although he asked appellant about it, she would not talk to Mike and insisted on waiting until Rene got home. Once home, Rene asked appellant what was going on. Appellant said she thought Rene was not going to pay her again even though appellant had said she would work until the end of October. When Rene assured her this was not the case, appellant agreed to stay through the end of the month but spent each night her aunt and uncle's house.

In preparation for appellant's departure, Rene began interviewing other nannies. On October 12, she got an unexpected call about a candidate, and Rene agreed to an interview that evening. Rene asked appellant if she could spend the night and fix macaroni and cheese for the children, telling her Mike would pick up dinner for the three adults. Appellant agreed. When Mike and Rene got home, the children were fine. Kyle seemed completely normal; he was not fussy and had no marks on his body. Appellant did not say anything had happened to him during the day. Neither twin was yet walking so the Lazarchiks carried the boys to their playroom where they stayed during the interview. Afterwards, the Lazarchiks got the boys and rocked them while talking with appellant about the candidate. Appellant then went upstairs to bed. Later, the Lazarchiks put the boys in their cribs and likewise went to bed.

On the morning of October 13, Kyle woke early and began crying. Despite having the start of a migraine headache, Rene got Kyle out of the crib and rocked him. He quickly stopped crying and fell back asleep. Mike took Kyle and continued to rock him while Rene went back to bed. Mike made breakfast and, with appellant's help, got the children dressed. Mike left around 8:30, dropping Alyssa at daycare on his way to work. Rene got up around 9:20 and got ready for work. She checked on the boys before leaving and kissed them goodbye. Both were fine and normal. Kyle was playing and smiling.

Later that day, appellant called Rene. She said Kyle was not breathing and she had called 911. Appellant told Rene she had fed the boys spaghetti, and after they were done, she put Kyle in the playroom. When she returned with Ryan, she noticed Kyle had thrown up. When Rene asked if there was anything Kyle could have gotten that would have caused choking, appellant repeatedly said no. Appellant did not say anything about Kyle hitting his head or that she hit his head. Rene called 911 to make sure they had the correct address and knew it was an infant in distress. She then rushed home, got Ryan and appellant, and met Mike at the McKinney

Hospital. They were told Kyle was being transferred to Children's Hospital by helicopter. Rene left appellant with Ryan and went with Mike to Children's where they saw Kyle. He had bruises all over his head, left arm, and left shoulder. A neurosurgeon met with Rene and Mike and told them Kyle had a severe brain injury and, although he would not survive surgery, time was of the essence and they had to do something to relieve the pressure on his brain. After giving permission for a pseudo-surgical procedure, the Lazarchiks met with Dr. Matthew Cox, a board certified child abuse pediatrician. After talking to Cox, Rene became concerned about Ryan and asked a friend to get him. Over the next two days, Kyle did not improve. When the doctors confirmed Kyle was brain dead, the Lazarchiks removed him from life support.

The morning after Kyle died, Rene's sister showed the Lazarchiks a cabinet in the kitchen where the pasta strainers, pots and pans, and orange juice pitcher were kept. The cabinet, which was frequently used, had been damaged. Rene opened the cabinet and saw "tape all over it like layers of tape all over all around the hinge, all around where it was coming apart." Rene said the cabinets were about four years old and that appellant had not mentioned one of them being damaged. She contacted the police to let them know about the cabinet.

Mike Lazarchik likewise testified that, other than being a little congested, Kyle was fine the evening of October 12 and the morning of October 13. Mike got the children up and, after carrying Kyle downstairs, made breakfast. He used the cabinet where the pots and pans were kept. It was not damaged or broken that morning. Kyle ate and exhibited no unusual behavior. Mike kissed the boys goodbye when he left; Kyle did not have any bruises and seemed normal.

Janet Wood was friends with the Lazarchiks. Rene called her from the hospital and asked her to check on appellant. According to Wood, appellant was sad and crying. Wood asked her what happened, and appellant told her Kyle just collapsed and fell down. Appellant said she performed CPR and it worked. She then told Wood that Kyle's brain was not fully developed.

Wood thought it was strange that appellant did not ask how either Kyle or Rene was doing. After staying for about an hour, Wood left to pick up her son from school. When appellant called Wood and asked "what was going on," Wood decided to return to the Lazarchik house. Appellant opened the door just as a police car drove by; she then fell to the floor and began wailing "no, no, no, no." She told Wood she would never hurt Kyle. Shortly thereafter, two female police officers arrived to speak with appellant.

McKinney Police officer Ida Wei Cover and Detective Kathy Hudson were sent to the Lazarchiks' house to investigate how Kyle was injured. When they approached the house, the front door was slightly open, and they heard appellant crying and screaming. After appellant calmed down, the officers asked her what happened. She said Kyle was acting normal and ate his spaghetti, but after she tried to burp him, he threw up. Appellant said she first called 911, then tried to remove any food or vomit from his mouth, placed him on a pillow, and administered CPR. She said she might have scratched Kyle's mouth when cleaning his mouth because he bled from the mouth. She told the officers she put Kyle on the pillow because "she didn't want to hurt him anymore." The story seemed inconsistent with Kyle's injuries so the officers continued to question appellant. As the interview continued, appellant told them Kyle bumped his head on the door frame while walking into the playroom. Cover told appellant that Kyle's injuries were not consistent with a minor head bump. Appellant then said Kyle was running when he hit the right side of his head on the door frame.

Detective James Adams interviewed appellant after she was arrested. Appellant told Adams that, on October 12th, Kyle had been sitting on the cabinet when he reached for something and fell off the counter. He hit his head on the floor, and appellant put a cold pack on it for thirty to forty minutes. When Adams asked appellant if she told Kyle's parents about his fall, she said she did not because Rene came home with a migraine and "wanted the lights out

and the house quiet, and Kyle seemed to be okay, had eaten and gotten sleepy." He asked why she had not told the other officers about the fall, and appellant said she did not think they would believe her. Adams later went to the Lazarchiks' house to look at the damaged cabinet door. The back of the cabinet door "had masking tape across the hinges down the split to hold it together, but it had split apart."

Dr. Cox said he briefly saw Kyle while in the Children's emergency room but fully examined him when he was in the intensive care unit in critical condition on full life support. Cox described Kyle as nonresponsive with fresh bruises on both sides of his head, his right temple, along his right hairline, his left elbow, and his left shoulder. Cox said that, based on the initial neurologic exam and early appearance of swelling of Kyle's brain, "it was quickly understood that his injury would be devastating and likely lethal just based on how he presented." Although the full body x-rays showed a normal skeletal survey, his head CAT scan showed a subdural hematoma and a hemorrhage between the two halves of the brain. Cox said the hemorrhage was the result of trauma, causing blood vessels to leak blood around the surface of the brain. The CAT scan also showed Kyle's brain was swelling and shifting down towards the spinal cord. Cox said the swelling could be the result of direct trauma to the brain or from lack of oxygen to the brain. Herniation, or brain shifting, resulted from the brain swelling; the brain structure moves because it has a limited cavity in which it can swell. Other symptoms of the brain shifting include slower breathing, slower heart rate, and dilated or "blown" pupils, all of which Kyle exhibited. The damage to Kyle's eyes, including the degree of hemorrhage and retina folding, was another marker of severe trauma. Cox also observed two small round bruises on Kyle's right temple.

The medical team noted three different areas of impact to Kyle's head with different areas of bruising; that both sides of the head and face area were impacted indicated more than

one forceful event occurred. A pressure measuring device was implanted to monitor Kyle's intracranial pressure and, on October 14, the pressure was four to five times the normal limit. Cox noted Kyle's injuries were new and saw no signs of prior or pre-existing injuries. In Cox's opinion, the injuries were not caused by a household fall, bumping his head on a door frame, or falling off a counter and hitting the floor. Cox explained that when a child falls or bumps his head, he has an isolated impact injury. In contrast, Kyle had a diffuse brain injury causing a comatose state with no normal neurologic function. Cox said rotational type of force tends to cause diffuse brain injuries like Kyle's, resulting from shaking or swinging a child's head into a cabinet. Children with fatal head injuries suffer traumatic events, like falling from a bridge, being in a car accident, or being abused; accidental injuries such as falling from a counter or hitting a head on a door frame do not result in severe head injuries like Kyle's. Rene and Mike said Kyle had eaten breakfast and been playing with blocks and crawling in a playhouse before they left for work. Cox said this activity was not consistent with someone who had a traumatic brain injury; in other words, Kyle would not have been able to do those things after suffering the head injuries he had. Cox also stated the edema Kyle had when he arrived at the hospital would not have been a result of a fall from a countertop the day before.

Dr. Darshan Phatak at the Dallas County Medical Examiner's office performed Kyle's autopsy. He observed multiple contusions on Kyle's head and Kyle's brain was twice the size it should have been because of the swelling. He also saw two one-eighth inch punctate abrasions on the right side of the forehead and a contusion on his upper left arm. Phatak estimated the bruises occurred within 24 to 48 hours before Kyle's death and were the result of at least three impacts to his head. Phatak confirmed the multiple subgaleal hemorrhages under Kyle's scalp as well as hemorrhages in the soft tissue surrounding his eyes and within the optic nerve sheath were the result of blunt force trauma to Kyle's head. Kyle also had subscalpular hemorrhages

located in the soft tissue overlying both sides of the skull. The trauma to Kyle's head tore the dural veins which then resulted in bleeding. Phatak said the symptoms from the dural veins tearing would be immediate, "a collapse . . . no response to any stimuli, any voluntary movement would not be possible at that point." As the blood collected, Kyle's brain began to swell and was pushed downward, accentuating the brain damage. Phatak determined the cause of death to be blunt force injuries of the head; the injuries were inconsistent with just one fall or accident because of the "three areas of hemorrhage in different portions of the head." Phatak measured the two punctate bruises on Kyle's forehead and said they were consistent with the measurements of two of the nails located on the cabinet door taken from the Lazarchiks' kitchen.

Viewing the evidence in the light most favorable to the verdict, the record shows Kyle was alive and unharmed on the morning of October 13. He ate the breakfast Mike made for him and was playing and smiling when Rene kissed him and left the house. Appellant was the only adult in the house with Kyle while Rene and Mike were gone. Appellant called Rene later to tell her Kyle was not breathing and she had called 911. Kyle was nonresponsive when the paramedics arrived; he was taken to the hospital where doctors discovered he had extensive bruising and severe head trauma that resulted in his death. The medical experts at trial testified Kyle's injuries were too severe to have been caused by falling from a counter to the floor or hitting his head on a door frame. They also testified the two punctate bruises on Kyle's forehead were consistent with the location and measurement of two nails located in a kitchen cabinet door that was discovered badly damaged. We conclude the evidence is legally sufficient to support appellant's conviction for capital murder of a child under the age of six years. We overrule appellant's first issue.

In her second and third issues, appellant contends the trial court erred by admitting evidence of two extraneous offenses. Appellant complains of evidence that, on separate

–10–

occasions, she broke a salt shaker and dislocated Kyle's elbow. The State offered the dislocated elbow incident to refute appellant's testimony that the children had not been hurt while in her care and to show appellant did not immediately report the injury to Kyle's parents. The broken salt shaker incident was offered to show the Lazarchiks did not get mad when appellant told them about it. Appellant claims this evidence was irrelevant and the prejudicial effect of its admission outweighed any probative value.

Even if we assume the trial court erred in admitting the evidence, any error was harmless. Texas Rule of Appellate Procedure 44.2(b) states an appellate court must disregard a non-constitutional error that does not affect a criminal defendant's "substantial rights." TEX. R. APP. P. 44.2(b). Under this rule, we may not reverse for non-constitutional error if, after examining the record as a whole, we have fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. *See Gray v. State*, 159 S.W.3d 95, 98 (Tex. Crim. App. 2005). In assessing the likelihood that the jury's decision was adversely affected by the error, we should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how the evidence might be considered in connection with other evidence in the case. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). We might also consider the jury instructions given by the trial judge, the State's theory, any defensive theories, and closing arguments. *Id*. The presence of overwhelming evidence of guilt plays a determinative role in this analysis. *Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008); *Motilla v. State*, 78 S.W.3d 352, 356 (Tex. Crim. App. 2002).

Our review of the record shows the State briefly asked Rene about Kyle's dislocated elbow and the broken salt shaker. Although the salt shaker was part of a set received as a wedding gift, Rene said she was disappointed but not upset with appellant. Rene believed the

elbow incident was an accident and used it as an opportunity to educate appellant. Although both parents were concerned about Kyle, they did not "react badly towards" appellant. Neither incident was essential to the State's case. The evidence was not inflammatory, misleading, or likely to confuse the jury. Finally, the State did not emphasize the evidence or mention it in closing. In light of the other overwhelming evidence, we have the fair assurance that the error, if any, in admitting this evidence did not have a substantial and injurious effect or influence in determining the jury's verdict. We overrule appellant's second and third issues.

We affirm the trial court's judgment.

/Molly Francis/
MOLLY FRANCIS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
121073F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ADA BETTY CUADROS-FERNANDEZ,
Appellant

No. 05-12-01073-CR       V.

THE STATE OF TEXAS, Appellee

On Appeal from the 380th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 380-80933-06.
Opinion delivered by Justice Francis,
Justices FitzGerald and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 5th day of December, 2013.

/Molly Francis/
MOLLY FRANCIS
JUSTICE