**Affirmed and Opinion Filed January 6, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00844-CR

### JOHNNY LEWIS, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 3**
**Dallas County, Texas**
**Trial Court Cause No. F11-21372-J**

## MEMORANDUM OPINION

Before Justices Bridges, Fillmore, and Lewis
Opinion by Justice Bridges

Johnny Lewis appeals his capital murder conviction. A jury convicted appellant, and the trial court sentenced him to life imprisonment. In four issues, appellant argues the evidence is legally insufficient to support his conviction and advances several reasons why the trial court erred in entering an order directing the withdrawal of funds from appellant's inmate account. We affirm the trial court's judgment.

Tiffany Staten testified she had a daughter, Sarai, born in May 2008. In July 2010, Staten met appellant at the car dealership where he worked, and they "hit it off in the beginning." They dated, and appellant moved in with Staten and Sarai in September 2010. Near the end of January 2011, appellant lost his job, but Staten continued to work at Chase bank. At approximately 3:00 a.m. on February 10, 2011, Staten woke up and went to check on Sarai. Sarai was lying

unconscious on the floor of her room. Staten was "frantic" and called for appellant, who came in the room, picked up Sarai, and started talking to her. Sarai made no response, and her eyes remained closed. Staten wanted to call 911, but appellant asked "to let him try this to see if it would revive her." Appellant said "he had experience in this," and he put Sarai in the shower. Sarai remained unconscious, and Staten called 911. An ambulance arrived less than ten minutes later.

Police officers also arrived and questioned Staten in the living room while appellant remained with Sarai and emergency medical personnel in Sarai's room. Sarai awoke, and Staten elected to take her to the hospital. At Children's Medical Center, the staff observed Sarai's oxygen levels and ran some blood work, but they "really didn't find anything." They discussed the possibility of seizures and sent Sarai home. Staten was told that when "an individual goes through a seizure it's between a four- to eight-hour period that you have to observe them afterward, because they're so tired from the body going through that." During the next few days, Sarai was "fine."

On the night of February 18, Staten and appellant had "a pretty good sized argument" about their relationship, but they "talked through it" and went to bed. The next morning, Staten left for work at approximately 6:00 a.m. after seeing Sarai, wearing a lavender top and a pullup, asleep in her bed. Staten planned to stay at work for three hours, and she left appellant alone with Sarai during that time. Staten had left Sarai alone with appellant for "one to two hours" one time before. At approximately 10:30 a.m., Staten called appellant to check on Sarai. Appellant said Sarai was "up, she was eating," and they were watching television. After stopping to buy milk, Staten arrived home at approximately 11:45 a.m. or 12:15 p.m. and found the living room unoccupied. She went to Sarai's room and found her lying in her room. Sarai's eyes were open, but she appeared semi-conscious and was unresponsive. Staten could not immediately tell what

Sarai was wearing because there was a cover over her body. Staten pulled back the cover and found Sarai was naked underneath.

Staten called for appellant, who came out of the back room. When Staten asked appellant what happened, he said "he was asleep and he wasn't sure." Appellant said he had tried to give Sarai a bath, but Sarai's body was dry and only the back of her hair was wet. Staten asked appellant why Sarai was not wearing clothes and why he gave her a bath. Appellant said Sarai "had used the restroom on herself and he gave her a bath." Staten continued to ask appellant questions about Sarai's lack of clothing while she dressed Sarai. Staten asked what happened and whether appellant had left Sarai alone. Appellant said "she was crying at some point and he put her in the room." Appellant said "he fell asleep and something must have happened to her."

Based on what appellant said, Staten assumed Sarai had a seizure, and she waited four hours "to see if [Sarai] were to come around." While she waited, Staten talked to Sarai, rubbed her hands, and rubbed her head. Sarai made some eye contact during this time but "not a whole lot." After four hours, Staten determined "it was time to go to the hospital." Appellant drove Staten and Sarai to Charlton Methodist Hospital where doctors determined Sarai's bodily organs were responsive but "her eyes were in a constant just stare, blank." After three or four hours at Charlton Methodist, Sarai was transported by ambulance to Children's Medical Center. Appellant and Staten followed in a car. During the drive, appellant told Staten "that if the police were to have any questions, make sure to tell them that he was not around."

At Children's Medical Center, a doctor examined Sarai and told Staten Sarai had "a 5 to 10 percent chance of living, and that if she were to make it through that 5 to 10 percent chance that she wouldn't be the same normal little girl." The doctors continued to treat Sarai, and Staten realized Sarai was not suffering a seizure but "some sort of abuse." Sarai's condition deteriorated, and she died in the hospital. Following Sarai's death, police spoke with Staten and

asked her to call appellant. Staten told appellant the police were implicating her in Sarai's death. Appellant said "we didn't do anything. She had a seizure and she died of natural causes."

Audra McCreight, an attending physician in the emergency room at Children's Medical Center, testified she was "basically in charge" of the emergency room when Sarai was transferred from Charlton Methodist Hospital. Also transferred were Sarai's medical records from her emergency room treatment at Charlton and her CT scan. Sarai was "completely unconscious" and was not breathing on her own. Sarai had bruising on the right side of her face, and there was an "immediate concern" that what happened to her was abuse. Sarai's CT scan showed she had "a very large, right-sided head bleed," called a subdural head bleed, that placed pressure on her brain. McCreight testified Sarai's bleeding was not the type of injury found in a child who "just had a seizure." Instead, her bleeding was the result of "some form of trauma to the head" that caused blood vessels to break. McCreight testified the trauma to Sarai's head followed by the bleeding led to her having seizures, "not the other way around." Sarai's injuries could not have been caused by "a short fall off a toddler bed" and McCreight testified "a body would have to sustain significant impact in order to have those type of injuries."

After reviewing Sarai's CT scan and treating her for several minutes, McCreight spoke with Staten and expressed her professional opinion that Sarai's injuries were "not survivable." Staten was "in shock" and "started rocking and just shaking her head." Appellant, also present, "stood away from [Staten] and started saying, 'I'm sorry, I'm sorry, I'm sorry.'" Appellant said he "had to go get some fresh air," and he left the hospital. Staten did not see him again.

Sarai was transported to intensive care where Dr. Lakshmi Raman treated her. Raman testified Sarai had bilateral subdural hemorrhages in her head and had been having seizures. Sarai also had hypoxic injury, "which means lack of oxygen to the brain." Raman saw bruising

around Sarai's eye, "the right eyelid, and also some bruising in the vaginal area." Raman determined Sarai was "brain dead:" her pupils were dilated, and she was not responding to any painful stimuli. About the time of her death, Sarai's "heart rate started going down and her blood pressure was really low." CPR was administered but subsequently discontinued so that Staten could hold Sarai when she died.

Jill Urban, a forensic pathologist who co-signed Sarai's autopsy report, testified Sarai died of "blunt force injuries and the manner of death was homicide." Sarai's injuries were "focused around the head." Sarai had "multiple bruises" both on the left and right cheeks and "areas of bruising that were visible on the forehead." An internal examination revealed "areas of hemorrhage within the scalp." Some of the areas of hemorrhage were adjacent to the bruises, and Urban testified hemorrhage in the scalp area is typically from an impact. Further examination showed Sarai's brain was "very swollen," and bleeding had occurred between the surface of the brain and the membrane that surrounds it.

Microscopic examination of Sarai's subdural hemorrhage revealed there were "actually two separate subdural bleeds." One showed "evidence of healing" suggesting "that subdural hemorrhage had been there for a week or two and then there was fresh bleeding on top of that." Urban testified the two "bleeds" were "consistent with two different impacts spread over time," and it was "entirely likely" that Sarai "received some sort of blow that resulted in her seizure ten days prior." In response to further questioning, Urban confirmed she was saying that the seizure-like symptoms Sarai experienced on February 10 "were probably the result of a blunt force injury."

Duncanville police detective David Moon testified he was assigned to investigate Sarai's death, and he went to Children's Medical Center where he spoke with Staten. Moon learned that appellant, who was no longer at the hospital, had lived with Staten and Sarai. Based on his

investigation at the hospital, Moon obtained a warrant to search Staten's residence and decided it was "important" to talk to appellant. After getting appellant's phone number from Staten, Moon left voicemail messages for appellant. Although appellant responded to the messages by leaving voicemails with the secretary of the Investigations Division, appellant did not call Moon's phone extension that Moon had left in a voicemail. On the morning of February 21, Moon contacted appellant by phone and said he needed to meet with appellant. Appellant said he was in Garland with his mother but had to go to work and had "a very full schedule." Appellant "just wasn't sure" when he could meet with Moon, and Moon told him, "Name the place and time." Appellant "continued to come up with excuses of why he was unable to meet [Moon] and said he might be able to come in after 5:00 o'clock that afternoon." However, appellant did not show up for the meeting. Moon subsequently obtained appellant's cell phone records and discovered appellant was in the vicinity of Lubbock, Texas, on February 21. Moon continued to monitor appellant's cell phone and tracked appellant to a location near Seattle, Washington. Moon also communicated with the U.S. Marshal Service Task Force in an attempt to locate appellant because a capital murder warrant had been issued for appellant's arrest. Moon became concerned that appellant was attempting to flee to Canada, and he contacted United States Border Patrol, United States Customs and Immigration, and state police in the jurisdictions through which appellant was traveling.

On February 26, Ty Elmendorf, a police officer in the city of Bellingham, Washington, was alerted to look for appellant when Billingham's 911 dispatch center was notified by the United States Border Patrol that appellant was in the area. In response to Elmendorf's notification to taxi companies and transit authorities in the area, a bus driver called Elmendorf to tell him appellant was on a bus headed down West Holly Street. Elmendorf knew the bus was headed to Lighthouse Mission, a homeless shelter, and Elmendorf intercepted the bus and saw

appellant get off. Elmendorf's partner arrived about the same time in a separate car, and both officers got out, drew their weapons, and ordered appellant to get down on his knees. Appellant fled on foot, and Elmendorf followed. In the course of the chase, appellant fell from a concrete barricade and did not get up. Two other officers arrested appellant, who gave a false name.

Anthony Sciarrone testified he was staying at the Lighthouse Mission on February 26 when appellant approached him and "said he needed to get into Canada." Appellant offered Sciarrone a gold chain and $20 and asked Sciarrone to go to Canada with him. Sciarrone thought appellant was attempting to entrap him. Sciarrone asked appellant if he was "by chance affiliated with any law enforcement agency or anything." Appellant said he had killed someone and was wanted for murder. Sciarrone "started to back out of the situation" and went inside and told the staff what appellant said.

Following his arrest in Washington, appellant was returned to Dallas where he shared an eight-person "tank" at Lew Sterrett Justice Center with Gregory Walker for "a month, a month and a half." Walker testified he was "the only one basically [appellant] talked to in the tank." Appellant said his girlfriend went to work and he was left alone with the baby, "the first time he ever baby-sat." The baby was "crying, hollering," and appellant tried to feed her. The baby was "still crying, hollering, so [appellant] went in the room where the baby was . . . picked the baby up and the baby hollering, trying to get away." Appellant picked the baby up and "he started shaking the baby." Appellant said he is "bipolar" and "can't really stand loud noises." After appellant shook the baby, he put her down, and she "went into, like, a seizure mode." The baby, in "seizure mode," had her "fists balled" but then "closed her eyes like she went to sleep." After it appeared the baby was sleeping, appellant got back in bed. After Staten returned home, she woke appellant and told him the baby was "not breathing or something." Appellant said he took the baby to the hospital and "talked to his sister husband" who told appellant to leave the

–7–

hospital. Appellant went home, and later on "some cops knocked on the door." Appellant "grabbed a duffel bag and his phone and went out the back door." Appellant took a bus to the Greyhound station and went to Washington State. Walker subsequently wrote a letter to the district attorney's office describing appellant's statements.

Appellant testified he "never disciplined" Sarai and never spanked her. Appellant testified that, on February 10, he was playing "the Play Station 3" in the front room when Staten called to him. Appellant ran back, saw Sarai having convulsions, and "had no idea what was going on." Staten "called the paramedics," but "the Duncanville police showed up first," and Staten got "really upset." Paramedics arrived, and Sarai was taken to the hospital where she was treated and released.

On the morning of February 19, appellant testified he was "in the bed asleep" when Staten got up and went to work. Appellant testified he did not get up while Staten was gone: he was asleep in his room and Sarai was in her room. Appellant answered the phone when Staten called and "said something about she was gonna get some milk," but he did not go in to Sarai's room. Appellant testified he was asleep when Staten got home; she woke him up and told him Sarai was "doing it again." Appellant also has seizures, and he said Sarai might be having a seizure. Appellant and Staten immediately took Sarai to the hospital where "the doctors took over" and appellant and Staten were in the waiting room. When a doctor came out and told them "Sarai had like a 50/50 chance," appellant "pretty well went off" and "went to crying." Appellant testified he told Staten he was going to "try to attempt to call [his] people and see what's going on." Appellant could not get cell phone reception in the hospital, however, and he told Staten he was going outside to call his parents. Appellant was unable to reach his mother, but he contacted his sister, and they "both got pretty much emotional." Appellant's sister gave the phone to her boyfriend, David, who told appellant he "didn't need to be up there" because he

–8–

had a prior conviction for injury to a child. Appellant got "all wired up" and "very, very nervous." David said he and appellant's sister were coming to the hospital, and appellant didn't "need to get involved in it at all."

Appellant testified he went back inside the hospital and told Staten he was "really nervous" but Staten was "comforting" and told appellant he "didn't do anything." Appellant said "David was talking about they'll put it on me anyway." Appellant went back outside and again called his sister, who said she was on her way to the hospital. Appellant returned inside the hospital where he again told Staten he was "real nervous about this" and did not think he "should be around." Appellant testified Staten told him he could go home if he wanted, and she would "take it from here." Appellant left the car keys with Staten and made his way home by bus. The landlord let appellant in because he had left his keys in the house. Inside the house, appellant saw "flashlights going through the house" and "panicked" when he looked out and saw police. Appellant left the house and "just took off." According to appellant, he left the state because he "just snapped" and "wasn't thinking at all." At some point, Staten talked to appellant on the telephone and said the police were thinking about locking appellant up, and that made appellant "even more paranoid." Appellant testified he did not know why he ended up in Washington, and he was "just riding on the bus." At the conclusion of trial, the jury found appellant guilty of capital murder, and this appeal followed.

In his first issue, appellant argues the evidence is insufficient to support his capital murder conviction. In reviewing a challenge to the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Lucio v. State*, 351 S.W.3d 878, 894–95 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). We are

required to defer to the factfinder's credibility and weight determinations because the fact finder is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 326. The fact finder may choose to believe or disbelieve all or any part of any witness's testimony. *Taylor v. State*, 106 S.W.3d 827, 830 (Tex. App.—Dallas 2003, no pet.).

A person commits capital murder if he knowingly causes the death of an individual under six years of age. Act of May 19, 2005, 79th Leg., R.S., ch. 428, § 1 2005 Tex. Gen. Laws 428 (current version at TEX. PENAL CODE ANN. §19.03(a)(8) (West Supp. 2013)). Direct evidence of the elements of the offense is not required. *Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007). The identity of the person committing the offense may be proven by direct or circumstantial evidence. *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986). Juries are permitted to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Hooper*, 214 S.W.3d at 14–15. Circumstantial evidence alone may be sufficient to establish guilt. *Id.* at 15. If an adult defendant has sole access to a child when the child sustains an injury, the evidence is sufficient to support a conviction for injury to a child or murder if the child dies. *Cuadros-Fernandez v. State*, 316 S.W.3d 645, 654 (Tex. App.—Dallas 2009, no pet.); *Elledge v. State*, 890 S.W.2d 843, 846–47 (Tex. App.—Austin 1994, pet. ref'd).

The indictment and jury charge in this case alleged appellant intentionally or knowingly caused Sarai's death by striking her with or against an unknown object, a deadly weapon, or by shaking her with his hands, a deadly weapon, and she was under six years of age at the time of the offense.

At trial, the evidence showed Staten left Sarai alone with appellant for approximately six hours. Before Staten left, Sarai was wearing a lavender top and a pullup, and she was asleep in

her bed. When Staten returned, Sarai was naked, semi-conscious, and unresponsive. When asked what happened, appellant stated "he was asleep and wasn't sure." Appellant claimed he had tried to give Sarai a bath, but only the back of Sarai's hair was wet. Sarai ended up at Children's Medical Center where she died from her injuries. Sarai's face was bruised, and she was bleeding inside her head, placing pressure on her brain. McCreight testified Sarai's injury was not the type of injury found in a child who "just had a seizure." Instead, her bleeding was the result of "some form of trauma to the head" that caused blood vessels to break. McCreight testified the trauma to Sarai's head followed by the bleeding led to her having seizures, "not the other way around." Sarai's injuries could not have been caused by "a short fall off a toddler bed" and McCreight testified "a body would have to sustain significant impact in order to have those type of injuries." In intensive care, Raman saw bruising around Sarai's eye, "the right eyelid, and also some bruising in the vaginal area." Urban testified Sarai died of "blunt force injuries and the manner of death was homicide." An internal examination revealed "areas of hemorrhage within the scalp." Some of the areas of hemorrhage were adjacent to the bruises, and Urban testified hemorrhage in the scalp area is typically from an impact. Further examination showed Sarai's brain was "very swollen," and bleeding had occurred between the surface of the brain and the membrane that surrounds it.

Appellant left the hospital when doctors told Staten Sarai had a "5 to 10 percent chance of living." Appellant did not return to the hospital; instead, he left the state and traveled to Washington State in an apparent attempt to flee to Canada. After he was apprehended, appellant was held in a tank where he told Walker he shook Sarai on the day he was left alone with her, and she went into "seizure mode." We conclude this evidence was sufficient to establish appellant committed capital murder. *See Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 14–15. The jury was free to disbelieve appellant's testimony that he was asleep the entire time he

was left alone with Sarai, Staten told him he should leave the hospital, and he did not know why he ended up in Washington State. *See Taylor*, 106 S.W.3d at 830. We overrule appellant's first issue.

In his second and third issues, appellant argues the trial court's order to the Texas Department of Criminal Justice ordering the withdrawal of funds from appellant's inmate trust fund account violated his right to due process and did not comply with the government code. In his fourth issue, appellant argues the evidence is legally insufficient to support the trial court's order concerning withdrawal of funds from his inmate trust fund account.

Contemporaneously with the judgment signed in this case on May 14, 2012, the trial court signed an order pursuant to section 501.014 of the Texas Government Code stating that appellant, who is in the custody of the Texas Department of Criminal Justice, Institutional Division, had incurred "Court costs, fees, and/or fines" in the amount of $239. *See* TEX. GOV'T CODE ANN. § 501.014 (West 2012). The court ordered payments to be withdrawn from appellant's inmate trust account until the total amount of court costs, fees and/or fines were paid in full.

Appellant attacks the validity of the garnishment on multiple grounds, but we lack jurisdiction over his complaints. Appellant's notice of appeal vested this Court with jurisdiction to review the judgment of conviction and sentence assessed in the criminal proceeding. *See Stansberry v. State*, 239 S.W.3d 260, 263 (Tex. Crim. App. 2007); TEX. R. APP. P. 25.2 (governing right to and perfection of appeal in criminal case). The notice of appeal did not, however, vest this Court with jurisdiction over the trial court's withdrawal order. The withdrawal order is not a criminal matter; it stems from a civil proceeding that is separate and independent from the judgment that assessed appellant's conviction and sentence. *See Harrell v. State*, 286 S.W.3d 315, 317–19 (Tex. 2009); *In re Johnson*, 280 S.W.3d 866, 873–74 (Tex. Crim.

App. 2008). Only a separate civil appeal from the withdrawal order would give this Court jurisdiction over that matter. *See, e.g., In re Pannell*, 283 S.W.3d 31, 34-35 (Tex. App.—Fort Worth 2009, no pet.); *Reed v. State*, 269 S.W.3d 619, 623–24 (Tex. App.—San Antonio 2008, no pet.). Because appellant did not file such an appeal, he failed to invoke our jurisdiction to consider issues pertaining to the withdrawal order. We therefore dismiss his second, third, and fourth issues.

We affirm the trial court's judgment.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

120844F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

JOHNNY LEWIS, Appellant

No. 05-12-00844-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 3, Dallas County, Texas
Trial Court Cause No. F11-21372-J.
Opinion delivered by Justice Bridges.
Justices Fillmore and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered January 6, 2014


/David L. Bridges/
DAVID L. BRIDGES
JUSTICE