

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00196-CR

———————————————

QUENTIN JAMAL WALKER, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. 1759203

_____

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

Following the death of two-year-old K.R.,[1] a jury found Appellant Quentin Jamal Walker guilty of manslaughter, injury to a child, and aggravated assault. *See* Tex. Penal Code Ann. §§ 19.04, 22.02(a)(1), (b)(1)(A), 22.04(a)(1), (e). The jury assessed Walker's punishment at fifteen years' confinement for manslaughter, thirty years' confinement for injury to a child, and twenty years' confinement for aggravated assault; the trial court sentenced him accordingly. In three points on appeal, Walker argues that (1) the evidence is insufficient to support his convictions for manslaughter and injury to a child, (2) the evidence is insufficient to support the deadly-weapon element of his conviction for aggravated assault, and (3) his conviction for manslaughter should be vacated because his convictions for *both* manslaughter and aggravated assault violate double-jeopardy principles. We will overrule Walker's sufficiency complaints and sustain his double-jeopardy complaint. Accordingly, we will vacate Walker's conviction for manslaughter and affirm the remainder of his convictions.

---

[1]To protect the anonymity of the victim in this case, we will use his initials to refer to him and will refer to his relatives by their relation to him. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

## II. BACKGROUND

### A. Walker's Relationship with K.R.'s Mother

In or around 2018, Walker began communicating with K.R.'s mother, B.R. (Mother), on Instagram. At that time, Walker was living in Arlington, Texas, and Mother was living near Houston, Texas, with K.R. and her mother, A.R. (Grandmother). During the following months, Walker and Mother started communicating by phone and FaceTime. In or around February 2019, Walker and Mother met for the first time in person when Walker traveled to the Houston area. Around that time, Mother was having disagreements with Grandmother about Mother's lifestyle, and Grandmother gave Mother thirty days' notice to leave the home that they shared.

In March 2019, Mother and K.R. moved to Arlington to be with Walker. According to Mother, her understanding was that Walker had a place to live and that she and K.R. would be moving into an apartment with him. In reality, however, Walker did not have a place to live.[2] Over the ensuing months, Walker, Mother, and K.R. stayed in hotels and slept in cars. Walker and Mother earned money by

---

[2]According to Walker, Mother knew that he was living in a car when they decided to move in together.

delivering food for DoorDash. According to Mother, they would spend around eight hours each day "DoorDashing" with K.R. in the car with them.[3]

During the months that Mother and K.R. were living with Walker, Walker shared in the responsibilities of parenting K.R., including disciplining him and attempting to potty train him. At trial, Mother testified that when he disciplined K.R., Walker would "whoop [him] with a belt to the point where [K.R.'s] legs would bleed."[4] Mother stated that Walker would discipline K.R. in this manner if K.R. got off the toilet before Walker told him to or if K.R. had gotten out of bed during a nap. She also indicated that Walker would "spank" or "whoop" K.R. for "peeing or pooping in his pull-up" and that K.R. had stopped telling them whenever he went "pee or poop in his pull-up." According to Mother, the discipline would last "[m]aybe two, three minutes, five at the most," and Walker would hit K.R. "[m]aybe five or six" times. Mother said that when she confronted Walker about his discipline of K.R., he told her that he knew what he was doing and that K.R. would "grow up to be soft" if he was not properly disciplined.

At trial, Walker admitted that as a form of discipline he had "tap[ped] [K.R.] on his butt with a belt," but Walker denied ever spanking K.R. with a belt on the legs.

---

[3]Mother also briefly worked at a warehouse. While she worked at the warehouse, K.R. remained with Walker.

[4]When speaking with detectives on the evening of K.R.'s death, however, Mother told detectives that Walker did not "go hard with the discipline."

4

Despite the discipline, Mother testified that Walker was "pretty good" with K.R., that K.R. loved Walker, that K.R. followed Walker around, and that K.R. referred to Walker as "Daddy." Walker stated that he and K.R. had a good relationship and that they were "joined at the hip."

## B. The Day of K.R.'s Death

On July 18, 2019, Walker, Mother, and K.R. woke up in a red car that they had been renting.[5] With K.R. in tow, Walker and Mother began "DoorDashing." At 2:12 p.m., they went to the Cobblestone apartment complex in Arlington.[6] At 2:28 p.m., Walker got out of the car to throw trash away. K.R. started "whining" when Walker got out of the car because K.R. "want[ed] to get out," too. According to Mother, when Walker arrived back at the car, he was upset that K.R. was whining. According to Walker, Mother was "annoyed" that K.R. was whining, and she told Walker that he "need[ed] to do something" about it and that Walker was "too soft." Walker took K.R. out of the car while Mother remained inside and watched videos on her phone. Mother testified that when Walker and K.R. first got out of the vehicle

---

[5]The vehicle had been rented in Mother's name and had not been returned per the rental agreement. The vehicle was reported stolen on July 14, 2019.

[6]According to Mother, they stopped at the apartment complex to clean out the rental car and so that she and Walker could smoke marijuana. She indicated that she and Walker had smoked marijuana "[m]aybe 30 minutes to an hour before" the "incident" happened. According to Walker, he and Mother did not use drugs on July 18, 2019, but he admitted that they had "smoke[d]" on July 17, 2019.

and walked away, she saw K.R. fall down but that he got back up. She then lost sight of them. Mother stated that K.R. was "fine" when he left the car with Walker.

Around twenty minutes later, Walker came back to the car without K.R. When Mother asked about K.R.'s whereabouts, Walker indicated that K.R. was "laying in the grass." Walker told Mother that he needed to change K.R.'s diaper, and he got a diaper from the vehicle and walked away. Mother testified that she did not look for K.R. because she was still watching videos on her phone. Five to ten minutes later, Walker returned to the car carrying K.R. and placed him in the back seat.

After Walker and K.R. returned to the car, Walker said that he would drive to Walmart so that they could purchase some water. Walker drove the trio out of the apartment complex at 2:59 p.m. When they arrived at Walmart, Mother went inside to purchase the water while Walker remained in the vehicle with K.R.[7] According to Walker, he watched videos on his phone while Mother made the purchase, and he did not check on K.R. When Mother returned to the car, she gave the bottles of water that she had purchased to Walker, who poured some water in the cap of a bottle to give to K.R. When K.R. would not take the water, Mother looked back at him and saw that he was "slumped over" in his seat. Mother indicated that K.R. looked "sleepy" and that he was breathing "really slow." When Mother asked Walker what was wrong with K.R., Walker stated that K.R. had fallen "in the grass."

---

[7]The water was purchased at 3:07 p.m.

Mother became increasingly concerned because K.R. began vomiting, his "eyes started rolling," and "he started breathing really fast and really heavy, and then he just stopped." Mother told Walker that they needed to take K.R. to the hospital. According to Mother, Walker did not take K.R.'s condition seriously until K.R. began vomiting. After K.R. vomited, Walker drove the trio to the hospital.

At 3:27 p.m., Mother entered the hospital carrying K.R. while Walker parked the car.[8] An emergency room physician did a head-to-toe physical examination of K.R. and did not notice any outward signs of trauma. But the physician observed that K.R.'s pupils were unequal and sluggish, which indicated to him that K.R. had suffered "[s]ome type of head trauma or brain injury." During a CT scan, K.R. went into cardiac arrest. After attempts to resuscitate him failed, K.R. was pronounced dead.

## C. Walker's Explanation

At trial, Walker testified about what had occurred between K.R. and himself after he took K.R. out of the car at the Cobblestone apartment complex. According to Walker, he took K.R. to a grassy area inside the complex. He stated that he and K.R. ran around the grassy area for around fifteen to twenty minutes. He said that he and K.R. were essentially playing a game in which K.R. tried to catch him. According to Walker, while they were playing, he looked behind him and saw K.R. on the

---

[8]At trial, Walker admitted that he did not park the car at the hospital because it was stolen.

ground trying to get up. Walker testified that he saw K.R. lying on K.R.'s back, but Walker stated that K.R. "had to [have] fall[en] on his stomach because he [had been] chasing [Walker]." Walker said that he went over to K.R., grabbed him, checked on him, and wiped the grass out of his hair. Walker admitted to "shaking" K.R. while checking on him, although Walker denied "violently shak[ing]" K.R.

Walker testified that he noticed that K.R.'s diaper was wet and weighing him down. So Walker went to the car to get a diaper while K.R. sat in the grass. Walker then picked K.R. up and carried him to the apartment complex's laundry room to change his diaper. Walker testified that K.R. was "normal at this point" but "seemed tired." After he changed K.R.'s diaper, Walker carried K.R. back to the car and placed him in the back seat. Walker stated that he did not know what caused K.R.'s death. Walker denied hitting K.R. in the head or slamming his head against a wall or hitting his head with an object. Walker also denied shaking K.R., apart from when he was checking on him after the alleged fall.

Walker also gave numerous statements to police, hospital personnel, and others about what occurred at the Cobblestone apartment complex. While many of these statements were repetitive of what he ultimately testified to at trial, there were several inconsistencies with his statements, and in some instances, there were outright lies. We detail the notable inconsistencies and lies:

- While Walker stated at trial that he had seen K.R. on his back after the alleged fall, he told detectives that K.R. had fallen on his stomach or had fallen "face

forward," and he demonstrated to a police officer that K.R. had fallen "face first" with his arms out.

- While Walker testified at trial that he went over to K.R., grabbed him, and checked on him after the alleged fall, he told detectives and hospital personnel that K.R. had "popped right back up" after the fall. He later told detectives that K.R. was on the ground for "a minute and [a] half or two minutes" after the alleged fall. He told another person that he shook K.R. for between twenty seconds to a minute while checking on him after the alleged fall.

- While Walker stated at trial that K.R. was sitting in the grass while Walker went to get a diaper from the car, he told detectives and hospital personnel that K.R. ran to the car after the alleged fall. Walker admitted at trial that he had lied when he had stated that K.R. had run to the car after the alleged fall.

- While Walker testified at trial that K.R. seemed "normal" in the laundry room, a person who interviewed Walker testified that Walker told him that K.R. began losing consciousness in the laundry room.

- While Walker admitted at trial that he had driven the stolen rental car to the hospital, he told a police officer that they had arrived at the hospital in either an Uber or a Lyft. At the hospital, Walker also told police that earlier in the day, the trio had been traveling in a gray sedan and that Mother had been driving. When asked about the location of that vehicle, Walker gave the officer "a couple of different locations," mentioning that the vehicle was at Walmart and the Cobblestone apartment complex. At trial, Walker admitted that he had lied about the car.

- During an interview with police, Walker told detectives that his mother and sister were close to K.R. and Mother. At trial, Walker admitted that this was a lie. He indicated that his mother had never even met K.R. or Mother.

## D. K.R.'s Autopsy

Marc Krouse, a former deputy chief medical examiner for the Tarrant County Medical Examiner's Office (TCMEO), performed an autopsy on K.R.'s body. Because Krouse was no longer employed by TCMEO at the time of trial, Tasha

Greenberg, the deputy chief medical examiner for TCMEO at the time of trial, reviewed the autopsy report made by Krouse and testified.

Greenberg testified that K.R. had sustained a single-sided subdural hematoma. She told the jury that subdural hematomas are typically caused by "some form of trauma." Greenberg stated that K.R. did not have any bruising on his scalp and that he did not have any skull fractures. She explained to the jury that this injury indicated "an impact . . . with a softer object" or "a different mechanism, something more like shaking with a rotational component." Greenberg testified that K.R.'s injuries could have been caused by someone shaking K.R. with his or her hand or hands or could have been caused by someone "striking [K.R.] with or against a hard or soft object or surface." She told the jury that hands can be considered a deadly weapon and that hands "can kill somebody and cause somebody's death." Greenberg opined that she did not believe that K.R.'s subdural hematoma was caused by a forward fall onto grass. But she stated that it was "[t]heoretically . . . possible" for an injury like K.R.'s to be sustained from a child's head coming into contact with a rock or a tree stump.

Greenberg also noticed that K.R. had "a small amount of arachnoid hemorrhage" on his "right side." She explained that the "arachnoid is the membrane that's tightly adherent to the brain" and that K.R.'s arachnoid hemorrhage was "a blush of blood that is right over the surface of the brain" and "right over the right temporal lobe of the brain." She stated that this injury was "consistent with the same trauma" associated with K.R.'s subdural hematoma. Greenberg noted that K.R.'s eyes

were examined by an ophthalmologic pathologist, who identified optic-nerve hemorrhages as well as retinal hemorrhages in both of K.R.'s eyes. Greenberg testified that retinal hemorrhages are consistent with incidents of blunt trauma of the head and incidents of shaking. Greenberg stated that the "presentation" of K.R.'s injuries "look[ed] a little bit more like a blunt[-]trauma" case than a "typical shaking" case because K.R. had a "single-sided subdural" while in a "typical shaking" case, there is damage on "both sides of the brain."

Krouse ruled that K.R.'s manner of death was homicide. Greenberg agreed. Krouse also determined that K.R.'s cause of death was blunt-force trauma of the head. Greenberg "[e]ssentially" agreed with that ruling, noting that K.R.'s cause of death was "head trauma." Greenberg testified that "[b]ut for being shaken [or] struck with or against something . . . K.R. would be alive today," noting that he was "an otherwise healthy child."[9]

Suzanne Dakil, an assistant professor of pediatrics at UT Southwestern and a board-certified physician in child-abuse pediatrics, reviewed K.R.'s medical records and autopsy records and testified at trial. When asked for her opinion regarding what caused K.R.'s injuries, Dakil stated, "So it was all on one side of his head or unilateral,

---

[9]In January 2019—before Mother and Walker met in person—K.R. hit his head on a bedpost and was taken to the emergency room at a hospital in The Woodlands, Texas. A CT scan from that hospital visit revealed "[n]o acute intracranial abnormalities" and no injuries. Both Mother and Grandmother testified that K.R. was "fine" after that incident. Greenberg testified that K.R.'s "knock in the head in January of 2019" did not contribute to his death.

and most commonly that implies a blunt force to the head that results in that type of one-sided brain injury." Dakil opined that Walker's description of shaking K.R. was not consistent with his injuries, noting that an injury caused by shaking a child typically results in "bleeding on both sides of the brain because the brain is moving so much with that repetitive motion." According to Dakil, K.R.'s injuries were "[m]ost likely [caused by] a direct blow of some kind to that side of the head, a violent strike or falling from a height." Dakil opined that K.R.'s injuries could not have been caused "by a ground fall from hi[s] running," stating that "a child -- a not quite three-year-old walking or running from standing height, falling . . . would not result in a fatal head bleed." Dakil also told the jury that potty training is a "trigger for abuse."

## E. Procedural Background

Walker was indicted on four counts: capital murder of a child, murder, injury to a child, and aggravated assault.[10] Following trial, the jury found Walker guilty of manslaughter (a lesser-included offense of the capital-murder charge), injury to a child, and aggravated assault. As noted above, the jury assessed Walker's punishment at fifteen years' confinement for manslaughter, thirty years' confinement for injury to a child, and twenty years' confinement for aggravated assault. The trial court rendered

---

[10]With respect to the aggravated-assault charge, the indictment alleged that Walker had used or exhibited a deadly weapon, namely, his hand or hands, in the commission of the offense.

judgment in accordance with the jury's verdicts and ordered Walker's sentences to run concurrently. This appeal followed.

## III. DISCUSSION

## A. Walker's Sufficiency Complaints

In his first two points, Walker challenges the sufficiency of the evidence to support certain elements of his convictions.

### 1. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*,

13

569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021); *see Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021).

### 2. Sufficiency of Walker's Convictions for Manslaughter and Injury to a Child

In his first point, Walker argues that the evidence is insufficient to support his convictions for manslaughter and injury to a child. Specifically, Walker argues that "there is no evidence of [his] actions or the requisite mental state" to support his convictions.

#### a. Applicable Law

A person commits manslaughter if he recklessly causes the death of an individual. Tex. Penal Code Ann. § 19.04(a). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* "Manslaughter is a result-oriented offense: the mental state must relate to the results of the defendant's actions." *Britain v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013).

15

A person commits a first-degree felony of injury to a child when the person intentionally or knowingly commits an act that causes a child serious bodily injury. Tex. Penal Code Ann. § 22.04(a)(1), (e). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." *Id.* § 6.03(b). Moreover, "[a] person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* "Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

A factfinder may infer that a person intends the natural consequences of his acts. *Harmel v. State*, 597 S.W.3d 943, 954 (Tex. App.—Austin 2020, no pet.); *Nicholson v. State*, 594 S.W.3d 480, 487 (Tex. App.—Waco 2019), *aff'd* 682 S.W.3d 238 (Tex. Crim. App. 2024). "A jury may also infer a defendant's knowledge or intent from any facts tending to prove its existence, including the method of committing the crime and the accused's acts, words, and conduct." *Nicholson*, 594 S.W.3d at 487 (citing *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002)).

### b. Analysis

To convict Walker of manslaughter, as modified by the indictment, the State had to prove that (1) Walker; (2) recklessly; (3) by shaking K.R. with his hand or hands, by striking K.R. with or against a hard or soft object or surface, or by manner and means unknown; (4) caused K.R.'s death. *See* Tex. Penal Code Ann. § 19.04(a). To convict Walker of injury to a child, as modified by the indictment, the State had to prove that (1) Walker; (2) intentionally or knowingly; (3) by shaking K.R. with his hand or hands, by striking K.R. with or against a hard or soft object or surface, or by manner and means unknown; (4) caused K.R. serious bodily injury. *See id.* § 22.04(a)(1), (e).

Here, the evidence reflects that K.R. was "fine" when he got out of the vehicle at the Cobblestone apartment complex and went with Walker. From that point until K.R.'s injuries began to manifest, Walker was the only person who was alone with K.R. Shortly after Walker returned K.R. to the car following their trip to the grassy field and the laundry room, K.R. "slumped over," looked "sleepy," and was breathing "really slow." He then vomited; his "eyes started rolling"; "he started breathing really fast and really heavy"; and "then he just stopped."

K.R.'s autopsy revealed that he suffered a single-sided subdural hematoma, an arachnoid hemorrhage to his right side, optic-nerve hemorrhages, and retinal hemorrhages. Greenberg testified that those injuries were consistent with head trauma and that the presentation of K.R.'s injuries looked like a "blunt[-]trauma" case.

17

K.R.'s manner of death was ruled a homicide, and Greenberg agreed with that ruling. K.R.'s cause of death was ruled as blunt[-]force trauma of the head, and Greenberg testified that the cause of K.R.'s death was "head trauma." Dakil testified that K.R.'s injuries were "[m]ost likely [caused by] a direct blow of some kind to that side of the head, a violent strike or falling from a height."

Both Greenberg and Dakil discounted Walker's theories of K.R.'s injuries—that he had been injured after a fall while playing or had been injured when Walker shook him while checking on him. To that end, Greenberg opined that she did not believe that K.R.'s subdural hematoma was caused by a forward fall onto grass, and Dakil opined that K.R.'s injuries could not have been caused "by a ground fall from hi[s] running" and that Walker's description of shaking K.R. after the alleged fall was not consistent with his injuries.

The jury could have reasonably believed that Walker—who had "whooped" K.R. in the past as a form of discipline when K.R. had soiled a diaper—became angry after hearing K.R. "whining" and after K.R. urinated in his diaper. Given the extent of K.R.'s injuries and the fact that Walker was the only person alone with K.R. before his injuries began manifesting, the jury could have reasonably believed that Walker struck K.R. with or against a hard or soft object or surface, or shook K.R. with his hand or hands, in such a violent manner that his actions resulted in K.R.'s death. *See Perez Hernandez v. State*, No. 13-16-00696-CR, 2019 WL 2127895, at *8 (Tex. App.— Corpus Christi–Edinburg May 16, 2019, pet. ref'd) (mem. op., not designated for

18

publication) ("When an adult defendant has had sole access to a child at the time the child sustained injuries, Texas courts have repeatedly found the evidence sufficient to support a conviction for intentional injury to a child or murder if the child dies."); *Martinez v. State*, 468 S.W.3d 711, 716 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (concluding that evidence was sufficient to support conviction for serious bodily injury to a child where the appellant "had been alone with [the child] at the approximate time he sustained extremely severe injuries"); *Elledge v. State*, 890 S.W.2d 843, 846–47 (Tex. App.—Austin 1994, pet. ref'd) (affirming conviction for injury to a child where the child suffered head injuries while alone with the appellant).

After viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that Walker recklessly caused K.R.'s death. *See* Tex. Penal Code Ann. § 19.04; *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *see also Perez Hernandez*, 2019 WL 2127895, at *8; *Guzman v. State*, No. 02-14-00297-CR, 2015 WL 6664471, at *4 (Tex. App.—Fort Worth Oct. 29, 2015, no pet.) (mem. op., not designated for publication) ("In determining whether a defendant recklessly caused serious bodily injury to a child, a jury is entitled to consider the extent of the child's injuries, the relative size of the child compared to the defendant, and expert testimony that a severe trauma was the cause of the child's injuries.").

Similarly, after viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found, beyond a

reasonable doubt, that Walker knowingly caused K.R. serious bodily injury. *See* Tex. Penal Code Ann. § 22.04(a)(1), (e); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Martinez*, 468 S.W.3d at 716; *Elledge*, 890 S.W.2d at 846–47.

Even if we could have found to the contrary were we sitting as the factfinder, we cannot act as the "thirteenth juror," and we may not substitute our judgment for that of the jury. *See Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014); *Burgess v. State*, No. 02-19-00203-CR, 2021 WL 3556953, at *3 n.6 (Tex. App.—Fort Worth Aug. 12, 2021, no pet.) (mem. op., not designated for publication) ("[T]he factfinder alone—in this case, the jury—judges the evidence's credibility, and we may not act as a thirteenth juror, re-evaluating the weight and credibility of the evidence and, thus, substituting our judgment for that of the factfinder.").

Moreover, the jury could have reasonably believed that Walker's inconsistencies in his explanation of what occurred at the Cobblestone apartment complex and his lies evidenced a consciousness of guilt. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (concluding that defendant's inconsistent statements and lies concerning his relationship with an accomplice were probative of wrongful conduct and were circumstances of guilt); *Bradley v. State*, No. 01-16-00375-CR, 2017 WL 4682184, at *3 (Tex. App.—Houston [1st Dist.] Oct. 19, 2017, pet. ref'd) (mem. op., not designated for publication) (holding that the defendant's "inconsistent statements, coupled with [his] admission that he lied to the police, support a reasonable inference of consciousness of guilt"); *Gray v. State*, No. 02-14-00249-CR, 2015 WL 6081668,

20

at \*4 (Tex. App.—Fort Worth Oct. 15, 2015, no pet.) (mem. op., not designated for publication) ("Moreover, the essential aspect of Gray's version of what happened—that Donovan fell down three or four stairs—is not supported by the evidence. Dr. Roberts testified that he had never seen a case in which a child's fall down three steps caused a subdural hematoma."). We overrule Walker's first point.

### 3. Sufficiency of Walker's Conviction for Aggravated Assault

In his second point, Walker argues that the evidence is insufficient to support his conviction for aggravated assault because the evidence is insufficient to support a finding that he used or exhibited a deadly weapon.[11]

#### a. Applicable Law

A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(B). A hand may be a deadly weapon based on its manner of use and its capacity to produce death or serious bodily injury. *Lane v. State*, 151 S.W.3d 188, 191 (Tex. Crim. App. 2004) (citing *Turner v.* State, 664 S.W.2d 86, 90 (Tex. Crim. App.

---

[11]The argument section relating to Walker's second point is limited to a discussion of whether or not the evidence shows that he used or exhibited a deadly weapon. We thus limit our analysis to that argument. *See* Tex. R. App. P. 47.1. To the extent that Walker sought to challenge any additional elements relating to his conviction for aggravated assault, he has waived such a challenge. *See Moblin v. State*, No. 07-07-0175-CR, 2008 WL 2511202, at \*3 (Tex. App.—Amarillo June 24, 2008, no pet.) (mem. op., not designated for publication) ("Although appellant indicates that he challenges the sufficiency of the evidence supporting his conviction, he has failed to provide any briefing on that matter. Because of that[,] the complaint was waived, and we overrule it.").

[Panel Op.] 1983)); *Hopper v. State*, 483 S.W.3d 235, 239 (Tex. App.—Fort Worth 2016, pet. ref'd). A person need not have intended to cause serious bodily injury or death or to have actually caused serious bodily injury or death for his hand to constitute a deadly weapon. *Hopper*, 483 S.W.3d at 239. As long as the totality of the evidence shows that the defendant's hand was capable of causing serious bodily injury or death in the manner that he used it, the jury is authorized to find that his hand qualified as a deadly weapon. *Id.* The injuries suffered by a victim are factors to be considered in determining whether a hand was used as a deadly weapon. *Lane*, 151 S.W.3d at 191.

### b. Analysis

Here, K.R. suffered from a single-sided subdural hematoma, an arachnoid hemorrhage to his right side, optic-nerve hemorrhages, and retinal hemorrhages. Greenberg testified that K.R.'s injuries could have been caused by someone shaking K.R. with his or her hand or hands or could have been caused by someone striking K.R. with or against a hard or soft object or surface. She also told the jury that hands can be considered a deadly weapon and that hands "can kill somebody and cause somebody's death." Moreover, Greenberg testified that K.R.'s injuries were consistent with head trauma and that the presentation of his injuries looked like a "blunt[-]trauma" case. Dakil similarly testified that K.R.'s injuries were "[m]ost likely [caused by] a direct blow of some kind to that side of the head, a violent strike or falling from a height." Dakil also stated that K.R.'s injuries could not have been

22

caused "by a ground fall from hi[s] running"—the type of fall described by Walker. Greenberg similarly stated that K.R.'s injuries were not caused by a forward fall onto grass. And, here, K.R.'s cause of death was listed as blunt[-]force trauma of the head, and Greenberg testified that the cause was "head trauma."

After viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that Walker used or exhibited his hand or hands as a deadly weapon in the commission of his aggravated assault against K.R. *See* Tex. Penal Code Ann. § 22.02(b); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Lane*, 151 S.W.3d at 192 (holding that evidence was sufficient to support a finding that the appellant used his hand and his foot as a deadly weapon when the appellant's assault of the victim resulted in the victim's suffering "a concussion to the brain, bruising, and temporary loss of consciousness"); *Hopper*, 483 S.W.3d at 240 ("Based on the rational inferences the jury could have drawn from the admitted evidence, the evidence is sufficient to show that Hopper used his hands in a manner that was capable of causing death or serious bodily injury."); *Gutierrez v. State*, No. 05-07-01330-CR, 2009 WL 1335154, at *4 (Tex. App.—Dallas May 14, 2009, pet. ref'd) (not designated for publication) (holding that, despite no witnesses to the alleged crime, the evidence was sufficient to support the jury's finding that the appellant used his hands as a deadly weapon to shake the almost two-year-old victim when "there was medical evidence indicating that the cause of [the victim's] brain and retina injuries was severe, violent shaking" and when experts

23

testified that shaking a child constituted the use of hands as a deadly weapon); *Dismuke v. State*, No. 05-04-01856-CR, 2006 WL 3200113, at *4–5 (Tex. App.—Dallas Nov. 7, 2006, pet. ref'd) (not designated for publication) (holding that, despite no witnesses to the alleged crime, the evidence was sufficient to support the appellant's conviction for capital murder of one-year-old victim by either shaking the victim with his hands or striking the victim with and against an unknown object where "it [was] undisputed that [the appellant] was alone with [the victim] during the time when [the victim's] injuries occurred" and "the jury heard medical testimony that [the victim's] injuries were so severe they could not have been caused by accident or by ordinary events"); *see also Garcia v. State*, No. 14-19-00975-CR, 2021 WL 3576372, at *2 (Tex. App.—Houston [14th Dist.] Aug. 12, 2021, pet. ref'd) (mem. op., not designated for publication) ("The fact that no witness, including [the victim], saw the knife in [the] appellant's hands is not determinative. There was circumstantial evidence at trial supporting the finding that [the] appellant used or exhibited a knife."). We overrule Walker's second point.

## B. Walker's Double-Jeopardy Complaint

In his third point, Walker argues that we should vacate his conviction for manslaughter because his convictions for *both* manslaughter and aggravated assault violate double-jeopardy principles. The State agrees and urges us to vacate Walker's conviction for manslaughter. We likewise agree with Walker's double-jeopardy complaint.

The Double Jeopardy Clause of the Fifth Amendment protects a defendant from multiple punishments for the same offense. U.S. Const. amend. V; *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977). The Double Jeopardy Clause is made applicable to the states through the Fourteenth Amendment. U.S. Const. amend. XIV; *Ex parte Benson*, 459 S.W.3d 67, 71 (Tex. Crim. App. 2015). When a defendant fails to preserve his double-jeopardy complaints, he may raise them for the first time on appeal if enforcing the usual rules of procedural default would serve no legitimate state interest and the undisputed facts show that the violation is clearly apparent on the face of the record. *Langs v. State*, 183 S.W.3d 680, 687 (Tex. Crim. App. 2006); *Stephenson v. State*, 673 S.W.3d 370, 387–88 (Tex. App.—Fort Worth 2023, pet. ref'd).

In the context of multiple punishments, two offenses may be the same if one is a lesser-included offense of the other or if the two offenses are defined under distinct statutory provisions but the Legislature made it clear that only one punishment is intended. *Littrell v. State*, 271 S.W.3d 273, 275–76 (Tex. Crim. App. 2008). "When multiple punishments arise out of one trial, the *Blockburger* test is the starting point in analyzing the two offenses."[12] *Bigon v. State*, 252 S.W.3d 360, 370 (Tex. 2008). "Under the *Blockburger* test, two offenses are not the same if one requires proof of an element

---

[12]*See Blockburger v. United States*, 284 U.S. 299, 300–05, 52 S. Ct. 180, 180–82 (1932).

that the other does not." *Id.* To make that determination, courts look to the elements as alleged in the charging instrument. *Id.*

Here, while similar, the elements for the charges for manslaughter and aggravated assault contain some differences. For example, the manslaughter charge required proof that Walker caused K.R.'s death, while the aggravated-assault charge required only proof of serious bodily injury to a member of Walker's family or household. *See* Tex. Penal Code Ann. §§ 19.04(a), 22.02(b)(1). Because the two offenses are not the same under the *Blockburger* test, we turn to whether the Legislature made it clear that only one punishment is intended under these circumstances. *See Villanueva v. State*, 227 S.W.3d 744, 747 (Tex. Crim. App. 2007) ("Application of *Blockburger* does not serve, however, to negate otherwise clearly expressed legislative intent."); *Roy v. State*, 76 S.W.3d 87, 95 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("Even when two penal statutes have unique elements, and are therefore not the same under *Blockburger*, other factors may lead to the conclusion that the legislature did not intend to permit multiple punishments when the same conduct violates both statutes.").

The following factors are used to determine whether the Legislature intended only a single punishment for multiple offenses even though the *Blockburger* test produced the conclusion that the offenses have different elements and presumptively permit multiple punishments: (1) whether the offenses are in the same statutory section or chapter, (2) whether the offenses are phrased in the alternative, (3) whether

26

the offenses are named similarly, (4) whether the offenses have common punishment ranges, (5) whether the offenses have a common focus or gravamen, (6) whether the common focus tends to indicate a single instance of conduct, (7) whether the elements that differ between the two offenses can be considered the same under an imputed theory of liability that would result in the offenses being considered the same under *Blockburger*, and (8) whether there is legislative history containing an articulation of an intent to treat the offenses as the same or different for double-jeopardy purposes. *Benson*, 459 S.W.3d at 72–73 (citing *Ervin v. State*, 991 S.W.2d 804, 814 (Tex. Crim. App. 1999)). "These factors are not exclusive, and the question ultimately is whether the legislature intended to allow the same conduct to be punished under both of the offenses." *Bigon*, 252 S.W.3d at 371.

As to whether the offenses are in the same statutory section, we note that manslaughter and aggravated assault appear in different chapters of the penal code, but this "does not necessarily mean that the Legislature intended the same conduct against the same victim to be punished under both statutes." *Shelby v. State*, 448 S.W.3d 431, 437 (Tex. Crim. App. 2014). And because the two statutes appear in different penal code chapters, they cannot be phrased in the alternative; thus, our consideration of that factor does not apply. *Id.* at 438 ("The two statutes cannot be phrased in the alternative because they appear in separate sections of the penal code. . . . The second *Ervin* factor, therefore, is not applicable."). While, facially, manslaughter and aggravated assault do not appear to be named similarly, "like

27

aggravated assault, manslaughter denotes an elevated level of assaultive conduct, so the names of the offenses are somewhat similar under the third factor." *Gunter v. State*, 673 S.W.3d 335, 346 (Tex. App.—Corpus Christi–Edinburg 2023, pet. ref'd).

"Of the *Ervin* factors, a common focus between the two statutes is the most reliable indicator of legislative intent and can be outcome determinative." *Id.* Here, manslaughter and aggravated assault have a common focus. The focus of manslaughter is "the death of an individual." Tex. Penal Code Ann. § 19.04(a). The focus of aggravated assault is "serious bodily injury." *Id.* § 22.02(b)(1)(A). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46). Moreover, both manslaughter and aggravated assault are result-oriented offenses. *Cf. Gunter*, 673 S.W.3d at 346 (stating that both intoxication manslaughter and aggravated assault are result-oriented offenses). And, here, the result of Walker's commission of both offenses was K.R.'s death. *Cf. id.* ("Therefore, although intoxication manslaughter and aggravated assault are not the same offense in all situations, under the circumstances of this case, both offenses resulted in [the victim's] death, and 'the sameness of the result is an indication that the Legislature did not intend to impose multiple punishments.'").

In our consideration of these factors, we may also look to the allowable unit of prosecution. *Bigon*, 252 S.W.3d at 371; *Gunter*, 673 S.W.3d at 346. "This analysis can

28

be instructive even though the two offenses are found in different statutory sections." *Gunter*, 673 S.W.3d at 346 (citing *Bigon*, 252 S.W.3d at 372). "The allowable unit of prosecution for an assaultive offense in Texas is each victim." *Shelby*, 448 S.W.3d at 439. "This is especially true when the assaultive conduct results in homicide." *Gunter*, 673 S.W.3d at 346; *see Johnson v. State*, 364 S.W.3d 292, 296 (Tex. Crim. App. 2012) ("With only one victim, there can be only one murder, regardless of how that murder is committed."). Applying those principles here, we hold that, under the circumstances of this case, Walker was punished twice for the same conduct that caused K.R.'s death. *See Gunter*, 673 S.W.3d at 346. Given the shared focus of the two offenses and the allowable unit of prosecution, we conclude that the Legislature did not intend for Walker to be punished under both statutes for the same conduct. *See id.* ("[W]e conclude that the Legislature did not intend for Gunter to be punished under both statutes for the same conduct."). Accordingly, we agree with Walker and the State that Walker's convictions for *both* manslaughter and aggravated assault violate double-jeopardy principles. We thus sustain Walker's third point.

When a multiple-punishment violation occurs, "the remedy is to affirm the conviction for the most serious offense and vacate the other convictions." *Bigon*, 252 S.W.3d at 372. Generally, the "most serious offense [is] the offense in which the greatest sentence was assessed." *Id.* at 373 (citing *Ex parte Cavazos*, 203 S.W.3d 333, 338 (Tex. Crim. App. 2006)). Here, the jury assessed Walker's punishment at twenty years' confinement for aggravated assault and fifteen years' confinement for

manslaughter. Accordingly, the proper remedy in this case is to affirm Walker's conviction for aggravated assault and vacate his conviction for manslaughter.

## IV. CONCLUSION

Having overruled Walker's first two points but having sustained his third, we vacate Walker's conviction for manslaughter and affirm the remainder of his convictions.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 11, 2024