

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00319-CR

———————————————

RAUL FABIAN ESPINOSARIOJAS, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court No. 1801185

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. Introduction

After eight-month-old Emily[1] was admitted to the hospital with significant brain injuries, a jury found Appellant Raul Fabian Espinosariojas guilty of aggravated assault against a family member with a deadly weapon causing serious bodily injury (Count One) and reckless injury to a child causing serious bodily injury (Count Two).[2] *See* Tex. Penal Code Ann. §§ 22.02(b)(1), 22.04(a), (e). The jury assessed Appellant's punishment at seventy years' confinement on Count One and twenty years' confinement on Count Two; the trial court sentenced him accordingly. In two points on appeal, Appellant argues that (1) there is insufficient evidence of causation and of his mental state to support his convictions for Counts One and Two and (2) the evidence is insufficient to support the deadly-weapon element of his conviction for Count One.[3] We will affirm.

---

[1]To protect the anonymity of the victim in this case, we will use an alias to refer to her and will refer to her relatives—other than Appellant—by their relation to her. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[2]Appellant was charged with intentional or knowing injury to a child, and the jury found him guilty of the lesser-included offense of reckless injury to a child. *See* Tex. Penal Code Ann. § 22.04(a), (e).

[3]The arguments in Appellant's brief are limited to a discussion of whether the evidence was sufficient to prove the causation and mens rea elements of Counts One and Two and the deadly-weapon element of Count One. We thus limit our analysis to these arguments. *See* Tex. R. App. P. 47.1. To the extent that Appellant sought to challenge any additional elements of these offenses, he has waived such a challenge.

## II. BACKGROUND

Appellant and Mother married in December 2019, and Emily was born in December 2020. Emily was born healthy and progressed normally over the next few months with no health issues or concerns. According to Mother, Appellant played with Emily "a little rough" and would sometimes throw her up in the air despite his parents' and Mother's admonishments that he should not throw little babies like that.

In June 2021, there was an incident culminating in Emily's being taken to the hospital. Emily had supposedly been drinking milk in the bedroom in the back of the house where Appellant was also located. Mother, who was in the front of the house with Grandmother, did not hear Emily making any sounds until Appellant came out of the room holding Emily and claiming that she was choking. Mother and Appellant drove Emily to the hospital, but the doctors could not initially find anything wrong with her. However, the doctors did not believe that Emily's symptoms had been caused by her choking on milk, and they wanted to keep her overnight for more tests. Even though Mother told Appellant that she thought that they should follow the doctors' advice and keep Emily at the hospital for further evaluation, Appellant refused the additional testing, stating that he had to work the next morning and that

---

*See Moblin v. State*, No. 07-07-0175-CR, 2008 WL 2511202, at *3 (Tex. App.—Amarillo June 24, 2008, no pet.) (mem. op., not designated for publication) ("Although appellant indicates that he challenges the sufficiency of the evidence supporting his conviction, he has failed to provide any briefing on that matter. Because of that[,] the complaint was waived, and we overrule it.").

"he did not want to stay for no reason." Emily seemed fine after leaving the hospital, so there were no follow-up visits. Appellant avoided Emily for a while afterwards but then continued to be rough with her.

On August 28, 2021, after an hours-long argument with Appellant, Mother made Emily a bottle and handed it to Appellant to give to Emily while Mother took a ten-minute shower. Mother could hear that Emily was still crying while she was in the shower and wondered why that would be the case since Appellant was supposed to be feeding Emily the bottle. The crying continued until Mother turned off the water and began drying off; at that point, Emily's crying "shut off," and there was silence. Mother thought that either Appellant had just begun giving Emily her milk or "something [had] happened." Appellant then came to the bathroom door holding Emily, who was "limp and discolored" and "looked dead." When Mother asked him what had happened, Appellant told her that she "was tripping" and that she was "always worried for nothing." Mother, acting swiftly, instructed Appellant to get dressed because they needed to rush Emily to the hospital. After they almost hit another car on the way to the hospital, Mother called 911. At the 911 dispatcher's direction, the family pulled into a gas station parking lot to wait for an ambulance.

After receiving the medical-emergency 911 call, Fort Worth Police Officer Matthew Thornton arrived at the gas station along with other first responders. Appellant handed Emily to Officer Thornton, who knelt down to hold her while the firefighters on the scene worked to stabilize her. Because Officer Thornton noticed

4

small red dots known as petechiae—which are a sign of strangulation—on Emily's left eyelid and underneath her left eye, he began a criminal investigation and interviewed Appellant and Mother regarding the cause of Emily's injuries. Based on Appellant's interview statements, Officer Thornton determined that if something criminal had occurred, Appellant was the likely suspect.

After receiving a call concerning Emily, Detective Brandon Latham of the Crimes Against Children Unit spoke with responding patrol officers and several members of the hospital emergency-room staff. Next, Detective Latham interviewed Mother to establish a timeline and then interviewed Appellant. One crucial, uncontroverted fact that could be gleaned from these interviews was that Appellant was the only person around Emily when she sustained the injury.

Over the course of his investigation, Detective Latham interviewed Appellant four separate times. Before the last of these interviews, Detective Latham had the opportunity to review Officer Thornton's bodycam footage and to talk to the medical professionals about their findings regarding the nature and potential causes of Emily's injuries. During the interview, Detective Latham relayed to Appellant that the medical professionals had concluded that violent shaking was the most likely cause of Emily's injuries[4] and emphasized that Appellant had been the only person around

---

[4]Detective Latham testified that Donna Wright, who was a member of "the Care Team," which is a group of "child abuse medical professionals who . . . specialize in physical and sexual abuse medicine," had explained that Emily's scans indicated a

Emily when her injury occurred. After being confronted with these findings, Appellant at first denied that he had shaken Emily but admitted that he had been rough with her at times and had tossed her in the air. When Detective Latham continued to point out that the roughhousing described by Appellant could not account for Emily's injuries, Appellant admitted that he had shaken Emily out of frustration and stress. But he later backtracked, claiming that he had shaken her only after she had become symptomatic.

Dr. Thangamadham Bosemani, a pediatric neuroradiologist, and Dr. Stephanie Acord, a pediatric neurologist, both testified extensively regarding Emily's injuries; the treatment, timeline, and cause of those injuries; and Emily's developmental progress before and after August 28, 2021. Based on Emily's CT scans, Dr. Bosemani found that (1) Emily's brain had abnormal density; (2) her brain covering (or dura), which is normally very closely attached to the brain surface, was separated from her brain with lots of blood and fluid in between; and (3) she had a skull fracture. Emily's CT scan also showed signs of decreased oxygen or blood flow to the brain. A skeletal survey revealed that Emily had a healing fracture on her right seventh rib. She also had retinal hemorrhages, which Dr. Acord explained tend to appear when "there's a significant amount of force" because "the eyes are tender."

---

"constellation of injuries that . . . separately would be considered indicia of abuse but collectively precluded the possibility that anything but abuse had occurred."

Dr. Acord detailed the developmental delays that Emily has experienced as a result of her injuries. Emily—who prior to August 2021 was developing normally, learning to pull herself to a tall kneel or standing position, and babbling—can now only roll in one direction, has poor head control, and cannot sit independently, crawl, or feed herself. She now uses a wheelchair and requires special equipment for standing and bathing. She also has poor vision because of the retinal hemorrhages and the injury to a large portion of her brain's occipital area. Because of her poor eyesight, she cannot see and grab things properly; as a result, she cannot feed herself or play with normal, age-appropriate toys.

Taking into account all of Emily's injuries, both doctors concluded that they were consistent with nonaccidental abusive head trauma. Both doctors agreed that Emily's injuries could have been caused by her having been violently shaken or by her having struck a hard object or surface with extreme force. They ruled out a number of other potential causes, including a sudden seizure; a short fall;[5] squeezing; striking her head on her crib; crying; efforts to stop her from coughing or choking such as

---

[5]Dr. Acord acknowledged that a fall could cause a skull fracture similar to what Emily suffered, but she explained that Emily's other injuries were not consistent with a fall and stated that she would expect to see more bruising and swelling as well as more crying on Emily's part if a short fall had caused the fracture.

7

rescue breaths, the Heimlich maneuver, or attempts to soothe her; Sandifer syndrome;[6] and patting on the back.

Neither doctor could state for certain whether all of Emily's injuries had occurred during Mother's ten-minute shower on August 28, 2021. But Dr. Bosemani confirmed that the trauma causing Emily's brain injuries must have occurred between twenty-four and forty-eight hours before Emily's first MRI on August 29, 2021.[7]

Following trial, the jury found Appellant guilty of Count One (aggravated assault against a family member with a deadly weapon causing serious bodily injury) and Count Two (reckless injury to a child causing serious bodily injury). The jury assessed Appellant's punishment at seventy years' confinement on Count One and twenty years' confinement on Count Two. The trial court rendered judgment in accordance with the jury's verdict and ordered Appellant's sentences to run concurrently. This appeal followed.

---

[6]Dr. Acord explained that Sandifer syndrome involves "seizure-like events" in which a baby arches her back and gets stiff.

[7]Dr. Bosemani explained that an MRI scan taken immediately after an acute brain trauma will not necessarily reflect all of a patient's injuries because many injuries will only show up twenty-four to forty-eight hours after the trauma. Emily received her first MRI on August 29, 2021, and received a second MRI over a week later. Given the changes between the two MRIs, Dr. Bosemani concluded that the trauma causing Emily's brain injuries occurred twenty-four to forty-eight hours before her first MRI on August 29, 2021.

## III. Discussion

In his two points, Appellant challenges the sufficiency of the evidence to support certain elements of his convictions.

### A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all

9

the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021); *see Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021).

## B. Sufficiency of the Evidence to Prove the Causation and Mens Rea Elements of Counts One and Two

In his first point, Appellant argues that the evidence is insufficient to support his convictions for Counts One and Two. Specifically, Appellant argues that "there is insufficient evidence of causation or of Appellant's requisite mental state." We disagree.

### 1. Applicable Law

A person commits assault if he "intentionally, knowingly, or recklessly causes bodily injury to another." Tex. Penal Code Ann. § 22.01(a)(1). Simple assault is raised to aggravated assault if the actor "causes serious bodily injury to another" or "uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02(a). Aggravated assault, which is ordinarily a second-degree felony, becomes a first-degree felony if "the actor uses a deadly weapon during the commission of the assault" and causes "serious bodily injury" to a family member. *Id.* § 22.02(b)(1)(A). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

A person commits a second-degree felony of injury to a child when the person recklessly commits an act that causes a child serious bodily injury.[8] *Id.* § 22.04(a)(1),

---

[8]As noted above, Appellant was charged with intentional or knowing injury to a child, a first-degree felony, but the jury found him guilty of the lesser-included

11

(e). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* "Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

In evaluating whether a defendant was reckless, we must analyze his conduct to determine whether

> (1) the alleged act or omission, viewed objectively at the time of its commission, created a "substantial and unjustifiable" risk of the type of harm that occurred;

> (2) that risk was of such a magnitude that disregard of it constituted a gross deviation from the standard of care that a reasonable person would have exercised in the same situation (i.e., it involved an "extreme degree of risk, considering the probability and magnitude of the potential harm to others")[;]

> (3) the defendant was consciously aware of that "substantial and unjustifiable" risk at the time of the conduct; and

> (4) the defendant consciously disregarded that risk.

---

second-degree-felony offense of reckless injury to a child. *See* Tex. Penal Code Ann. § 22.04(a), (e).

*Id.* at 755–56 (footnote omitted). A jury may infer a defendant's mental state from circumstantial evidence, including the defendant's acts, words, and conduct; the extent of the victim's injuries; and the parties' relative size and strength. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Rhymes v. State*, 536 S.W.3d 85, 95 (Tex. App.—Texarkana 2017, pet. ref'd) (citing *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995)). "The State does not need to prove the defendant's awareness of a specific risk in order to establish that the defendant's act involved a substantial and unjustifiable risk." *Mead v. State*, No. 02-20-00041-CR, 2021 WL 5933786, at *12 (Tex. App.—Fort Worth Dec. 16, 2021, no pet.) (mem. op., not designated for publication) (first citing *Assavedo v. State*, Nos. 05-15-00480-CR, 05-15-00481-CR, 2016 WL 4123690, at *5 (Tex. App.—Dallas July 29, 2016, no pet.) (mem. op., not designated for publication); and then citing *Trepanier v. State*, 940 S.W.2d 827, 829 (Tex. App.—Austin 1997, pet. ref'd)); *see also Nicholson v. State*, 594 S.W.3d 480, 489 (Tex. App.—Waco 2019) (clarifying that to show recklessness, "[t]he State need not prove awareness of a specific risk to a specific individual"), *aff'd* 682 S.W.3d 238 (Tex. Crim. App. 2024).

### 2. Analysis

To convict Appellant of Count One (aggravated assault against a family member with a deadly weapon causing serious bodily injury), as modified by the indictment, the State had to prove that (1) Appellant; (2) intentionally, knowingly, or recklessly; (3) caused serious bodily injury to Emily; (4) by shaking or jerking her with

his hand or by striking her against a soft or hard object or surface; and (5) that Appellant used or exhibited a deadly weapon, namely his hand or a soft or hard object or surface, during the commission of the assault. *See* Tex. Penal Code Ann. §§ 22.01(a)(1), 22.02(a), (b)(1)(A). Similarly, to convict Appellant of Count Two (reckless injury to a child), as modified by the indictment, the State had to prove that (1) Appellant; (2) recklessly; (3) caused Emily serious bodily injury; (4) by shaking or jerking her with his hand or by hitting her against a soft or hard object or surface. *See id.* § 22.04(a)(1), (e).

Here, the evidence, including Appellant's own timeline,[9] showed that on August 28, 2021, Emily was behaving and crying normally before Mother took a ten-minute shower; Appellant was the only person in the room with Emily while Mother was in the shower; Mother heard Emily's crying instantly "shut off" when she was in the shower; and after Mother's shower Emily "looked dead" and "was limp and discolored." Dr. Bosemani confirmed that the trauma causing Emily's brain injuries must have occurred between twenty-four and forty-eight hours before Emily's first MRI on August 29, 2021. Dr. Acord opined that the types of injuries reflected on Emily's brain scans would cause "a rather abrupt onset of symptoms." Both Dr. Bosemani and Dr. Acord testified that Emily's injuries could have been caused by her

---

[9]During his last interview with Detective Latham, Appellant repeatedly refuted the notion that any other member of the household could have had access to Emily when her injuries occurred and definitively stated that "there [was] nobody else in the timeline."

14

having been violently shaken or by her having struck a hard object or surface with extreme force, and they refuted other potential causes. Dr. Bosemani testified that an adult man's hands could cause serious bodily injury of the kind Emily suffered.

Both doctors testified regarding the extent of Emily's injuries, and Dr. Acord described the developmental delays Emily has experienced as a result. When Detective Latham confronted Appellant with the doctors' findings regarding the nature and likely causes of Emily's injuries, Appellant admitted that he had shaken Emily. Although Appellant later backtracked and claimed that he had shaken Emily only after she became symptomatic, the jury was free to disbelieve this claim. *See Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021); *see also Jones v. State*, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998) ("The trier of fact is always free to selectively believe all or part of the testimony proffered and introduced by either side." (citing *Bignall v. State*, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994))).

Even apart from Appellant's admission that he had shaken Emily, there was sufficient evidence of causation. Given the nature and extent of Emily's injuries and the fact that Appellant was the only person alone with her in the moments before her injuries began manifesting, the jury could have reasonably determined that Appellant caused Emily's injuries by shaking or jerking her with his hand or striking her against a hard or soft object. *See Perez Hernandez v. State*, No. 13-16-00696-CR, 2019 WL 2127895, at *8 (Tex. App.—Corpus Christi–Edinburg May 16, 2019, pet. ref'd) (mem. op., not designated for publication) ("When an adult defendant has had sole access to

15

a child at the time the child sustained injuries, Texas courts have repeatedly found the evidence sufficient to support a conviction for . . . injury to a child . . . ."); *Martinez v. State*, 468 S.W.3d 711, 716 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (concluding that evidence was sufficient to support conviction for serious bodily injury to a child where the appellant "had been alone with [the child] at the approximate time he sustained extremely severe injuries"); *Elledge v. State*, 890 S.W.2d 843, 846–47 (Tex. App.—Austin 1994, pet. ref'd) (affirming conviction for injury to a child where the child suffered head injuries while alone with the appellant); *see also Walker v. State*, No. 02-23-00196-CR, 2024 WL 3364823, at *7 (Tex. App.—Fort Worth July 11, 2024, no pet. h.) (mem. op., not designated for publication) ("Given the extent of [the child's] injuries and the fact that [appellant] was the only person alone with [the child] before his injuries began manifesting, the jury could have reasonably believed that [appellant] struck [the child] with or against a hard or soft object or surface, or shook [the child] with his hand or hands, in such a violent manner that his actions resulted in [the child's] death.").

Further, viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact—considering Emily's lack of size and strength compared to Appellant, the extent of her injuries, the method used to produce her injuries, and the doctors' testimony that inflicted trauma was the likely cause of her injuries—could have found, beyond a reasonable doubt, that Appellant's conduct was reckless. *See* Tex. Penal Code Ann. §§ 6.03(c), 22.01(a)(1), 22.02(a), (b)(1)(A),

16

22.04(a)(1), (e); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *see also Guevara*, 152 S.W.3d at 50; *Rhymes*, 536 S.W.3d at 95; *Guzman v. State*, No. 02-14-00297-CR, 2015 WL 6664471, at *4 (Tex. App.—Fort Worth Oct. 29, 2015, no pet.) (mem. op., not designated for publication) ("In determining whether a defendant recklessly caused serious bodily injury to a child, a jury is entitled to consider the extent of the child's injuries, the relative size of the child compared to the defendant, and expert testimony that a severe trauma was the cause of the child's injuries."). Indeed, it is objectively unsafe to throw or shake an eight-month-old infant in a way that would cause such injuries, and doing so constitutes a gross deviation from the standard of care that a reasonable person would exercise. *See Williams*, 235 S.W.3d at 755; *cf. Moore v. State*, 154 S.W.3d 703, 713 (Tex. App.—Fort Worth 2004, pet. ref'd) (noting doctor's opinion that "anyone would immediately recognize the act of shaking a baby as dangerous, '[u]nless they came from outer space'"). Additionally, given the record's reflection that (1) Appellant's parents and Mother told him multiple times not to be so rough with Emily; (2) Appellant knew that he had been rough with her; and (3) Emily's June 2021 "choking" episode had led to her being taken to the hospital, and Appellant had avoided Emily for a while after that before resuming his rough handling of her, a rational juror could conclude that Appellant was aware of—but disregarded—the risks of his conduct. *See Williams*, 235 S.W.3d at 756. Thus, there is sufficient evidence that Appellant acted recklessly.

Even if we could have found to the contrary were we sitting as the factfinder, we cannot act as the "thirteenth juror," and we may not substitute our judgment for that of the jury. *See Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014); *Burgess v. State*, No. 02-19-00203-CR, 2021 WL 3556953, at *3 n.6 (Tex. App.—Fort Worth Aug. 12, 2021, no pet.) (mem. op., not designated for publication) ("[T]he factfinder alone—in this case, the jury—judges the evidence's credibility, and we may not act as a thirteenth juror, re-evaluating the weight and credibility of the evidence and, thus, substituting our judgment for that of the factfinder.").

Having concluded that based on the evidence presented at trial, a rational factfinder could have found beyond a reasonable doubt that Appellant recklessly caused Emily's serious bodily injuries, we overrule Appellant's first point. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

## C. Sufficiency of the Evidence to Prove Count One's Deadly-Weapon Element

In his second point, Appellant argues that the evidence is insufficient to support his conviction for Count One because it does not support the jury's finding that he used or exhibited a deadly weapon. Again, we disagree.

### 1. Applicable Law

A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(B). A hand may be a deadly weapon based on its manner of use and its capacity to produce death or serious bodily injury. *Lane v. State*, 151 S.W.3d 188, 191

(Tex. Crim. App. 2004) (citing *Turner v.* State, 664 S.W.2d 86, 90 (Tex. Crim. App. [Panel Op.] 1983)); *Hopper v. State*, 483 S.W.3d 235, 239 (Tex. App.—Fort Worth 2016, pet. ref'd). A person need not have intended to cause serious bodily injury or death or to have actually caused serious bodily injury or death for his hand to constitute a deadly weapon. *Hopper*, 483 S.W.3d at 239. As long as the totality of the evidence shows that the defendant's hand was capable of causing serious bodily injury or death in the manner that he used it, the jury is authorized to find that his hand qualified as a deadly weapon. *Id.* The injuries suffered by a victim are factors to be considered in determining whether a hand was used as a deadly weapon. *Lane*, 151 S.W.3d at 191; *see also Tucker v. State*, 274 S.W.3d 688, 691–92 (Tex. Crim. App. 2008) ("[T]he injuries suffered by the victim can by themselves be a sufficient basis for inferring that a deadly weapon was used.").

### 2. Analysis

Here, the evidence showed that Emily suffered extensive injuries, including (1) a subdural hematohygroma; (2) a skull fracture; (3) a rib fracture; (4) hypoxia ischemia; (5) restricted diffusion across the entire upper portion of her brain; (6) retinal hemorrhages; (7) signs of contusion and shearing from her brain, spinal cord, or both going back-and-forth; and (8) loss of brain volume. Both Dr. Bosemani and Dr. Acord testified that Emily's injuries were consistent with nonaccidental abusive head trauma. They both agreed that Emily's injuries were likely caused by her having been violently shaken or by her having struck a hard object or surface with

19

extreme force, and they ruled out a number of other potential causes. Further, Dr. Bosemani specifically testified that when they are used to shake a young child, an adult man's hands are capable of causing serious bodily injury to that child.

After viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that Appellant used or exhibited his hand (or a soft or hard object or surface) as a deadly weapon in the commission of his aggravated assault against Emily. *See* Tex. Penal Code Ann. § 22.02(b); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Lane*, 151 S.W.3d at 192 (holding that evidence was sufficient to support a finding that the appellant used his hand and his foot as a deadly weapon when the appellant's assault of the victim resulted in the victim's suffering "a concussion to the brain, bruising, and temporary loss of consciousness"); *Hopper*, 483 S.W.3d at 240 ("Based on the rational inferences the jury could have drawn from the admitted evidence, the evidence is sufficient to show that Hopper used his hands in a manner that was capable of causing death or serious bodily injury."); *Walker*, 2024 WL 3364823, at *9 (concluding that, despite no witnesses to the alleged crime, a rational trier of fact could have found beyond a reasonable doubt that appellant had "used or exhibited his hand or hands as a deadly weapon" in committing aggravated assault against a child where there was expert testimony that the child's injuries "were consistent with head trauma" and "were '[m]ost likely [caused by] a direct blow . . . to [the] side of the head, a violent strike, or falling from a height'" and that the injuries could not have

20

been caused by a ground fall while running or a forward fall onto grass as posited by appellant); *Gutierrez v. State*, No. 05-07-01330-CR, 2009 WL 1335154, at *4 (Tex. App.—Dallas May 14, 2009, pet. ref'd) (not designated for publication) (holding that, despite no witnesses to the alleged crime, the evidence was sufficient to support the jury's finding that the appellant used his hands as a deadly weapon to shake the almost two-year-old victim when "there was medical evidence indicating that the cause of [the victim's] brain and retina injuries was severe, violent shaking" and when experts testified that shaking a child constituted the use of hands as a deadly weapon); *Dismuke v. State*, No. 05-04-01856-CR, 2006 WL 3200113, at *4–5 (Tex. App.—Dallas Nov. 7, 2006, pet. ref'd) (not designated for publication) (holding that, despite no witnesses to the alleged crime, the evidence was sufficient to support the appellant's conviction for capital murder of one-year-old victim by either shaking the victim with his hands or striking the victim with and against an unknown object where "it [was] undisputed that [the appellant] was alone with [the victim] during the time when her injuries occurred" and "the jury heard medical testimony that [the victim's] injuries were so severe they could not have been caused by accident or by ordinary events"); *see also Garcia v. State*, No. 14-19-00975-CR, 2021 WL 3576372, at *2 (Tex. App.—Houston [14th Dist.] Aug. 12, 2021, pet. ref'd) (mem. op., not designated for publication) ("The fact that no witness, including [the victim], saw the knife in [the] appellant's hands is not determinative. There was circumstantial evidence at trial

supporting the finding that [the] appellant used or exhibited a knife."). We overrule Appellant's second point.

## IV. CONCLUSION

Having overruled both of Appellant's points, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 8, 2024